RICHARD BASS, Indiv. and Derivatively on Behalf of Innovative Consultants, Inc., Plaintiff-Appellee, v. SMG, INC., Defendant-Appellant.

First District (2nd Division)   No. 1—01—0907

Opinion filed February 26, 2002.

John P. Morrison, of Bell, Boyd & Lloyd, of Chicago, and Michael L. Scheier and Jamie M. Ramsey, both of Keating, Muething & Klekamp, of Cincinnati, Ohio, for appellant.

Ralph M. Bernstein and Philip J. Bernstein, both of Ralph M. Bernstein & Associates, of Chicago, for appellee.

JUSTICE GORDON delivered the opinion of the court:

## NATURE OF THE CASE

Defendant SMG, Inc. (defendant or SMG), appeals a decision of

the circuit court of Cook County denying its motion to compel arbitration of tort claims brought by plaintiff Richard Bass (plaintiff or Bass) individually and derivatively as a shareholder of Innovative Consultants, Inc. (IC). The circuit court rejected defendant's argument that the brokerage agreement between SMG and IC (agreement or SMG-IC agreement), which contained an arbitration clause, made arbitration the appropriate mechanism for resolving Bass' claims for inducement to breach fiduciary duty, tortious interference with a contract, tortious interference with business expectancy and conspiracy. Pursuant to Supreme Court Rule 307(a)(1) (188 Ill. 2d R. 307(a)(1)) (Rule 307), defendant brought this interlocutory appeal, arguing that the arbitration clause in the agreement is generic and sufficiently broad to cover plaintiff's tort claims as they relate to the terms of the agreement. For the reasons stated below, we reverse the circuit court's dismissal of SMG's motion to compel arbitration of plaintiff's derivative claims and remand with directions to order the parties to proceed to arbitration under the terms of the agreement. We affirm the circuit court's denial of defendant's motion to compel arbitration of plaintiff's individual claims.

## BACKGROUND

Bass filed an eight-count complaint against SMG and David Shapiro (Shapiro) in the circuit court of Cook County in July 2000. In that complaint Bass alleged the following background facts: IC was incorporated in 1989 as a broker of food products, assisting sellers in developing and buyers in obtaining specialized food lines. From the time of incorporation through the outset of the instant lawsuit, Shapiro has been president and controlling shareholder of IC, owning 51% of the outstanding voting stock. Bass is a director and the secretary-treasurer of IC, owning the remaining 49% of the voting stock. From its inception, IC developed a relationship with Den Fujita & Co., Ltc. (Fujita), a company holding 50% ownership of the McDonald's restaurant franchise in Japan, with an interest in purchasing food products in the United States. SMG is a food products supplier and in December 1994, it entered into a "Sales Representative Agreement" with IC under which IC was appointed the exclusive sales representative for a line of SMG products to be sold to Fujita, its subsidiaries and affiliates.[1]

Under the agreement, SMG was to pay IC a commission of 3% on all sales of this line to Fujita. The agreement also required that SMG

---

[1]The text of the agreement, which is unchallenged, was submitted to the court by SMG as an appendix to the "Motion to Dismiss and to Compel Arbitration" that SMG filed in lieu of an answer to Bass' complaint.

not sell any other product lines to Fujita. The agreement was to remain in effect until December 15, 1999, and thereafter was automatically renewed for periods of one year unless either party elected to terminate by written notice not later than 90 days prior to the next scheduled termination date. The final clause in the agreement referred to arbitration and read: "In the event of any dispute, claim or controversy between the parties regarding this Agreement, such dispute, claim or controversy shall be settled by arbitration in Chicago, Illinois, by a single arbitrator under the then commercial arbitration rules of the American Arbitration Association."

During the life of the agreement, IC worked with SMG to develop and sell products to Fujita. IC's commissions on these sales averaged $40,000 per year until 1999 when Fujita placed sample orders of SMG products for a trial promotion, boosting IC's commission to $97,000. Bass alleged that if the trial promotion were successful, Fujita planned to continue this expanded purchasing from SMG.

In August 1999, SMG gave written notice to IC that it was terminating the agreement, effective December 15, 1999. The parties do not contest that the termination was conducted as provided in the agreement. Bass alleged, however, that at about the same time the agreement was terminated, SMG offered Shapiro a position as "Vice President of International Sales" under which he would receive a salary and a 1.5% commission on the sale of SMG products to Fujita. Bass alleged that Shapiro's employment with SMG effectively ended IC's business relationship with Fujita, but did not allege that the relationship denied IC any financial benefit outside the commissions from SMG. In seeking relief against SMG and Shapiro, Bass alleged that their "misappropriating, purloining and otherwise wrongful dealing with IC's contractual customer and usurping and misappropriating business opportunities that rightfully belong to IC and Bass have had a devastating effect on IC's business by decreasing IC's sales and commission income."

Specifically, count I of the complaint alleged breach of fiduciary duty and misappropriation of business opportunity against Shapiro and requested actual damages. Count II realleged this claim and requested punitive damages. Count III alleged that SMG tortiously induced Shapiro to breach his fiduciary duty to IC, and count IV requested punitive damages for this inducement. Count V alleged that SMG tortiously interfered with the contract among Shaprio, Bass and IC. Count VI alleged that SMG tortiously interfered with the business expectancy arising from IC's relationship with SMG and from IC's relationship with Fujita. Count VII requested punitive damages on the same claim. Finally, count VIII alleged conspiracy against both SMG

and Shapiro. When the instant appeal reached this court, Bass had settled his claims against Shapiro individually; thus, the only the claims currently before us are against SMG.

Without challenging the factual allegations made in Bass' complaint, SMG filed combined motions to dismiss and to stay the proceedings. SMG moved to dismiss Bass' individual claims because he was not the real party in interest and lacked standing to maintain an individual, as opposed to a derivative, suit. SMG also moved to stay the proceedings and compel arbitration of Bass' claims pursuant to the arbitration clause. The trial court denied both motions and, under Rule 307, SMG appealed the decision to this court.

Upon receiving defendant's appellate brief, Bass filed a motion to dismiss and strike arguments pertaining to the issue of whether he had standing to sue in his individual capacity, which we also shall address in this opinion.

## ANALYSIS

■ We note at the outset that this is not an appeal from a final order. We have jurisdiction over this interlocutory order, however, under Rule 307 because a motion to compel arbitration is analogous to a motion for injunctive relief. *Nagle v. Nadelhoffer, Nagle, Kuhn, Mitchell, Moss & Saloga, P.C.*, 244 Ill. App. 3d 920, 924, 613 N.E.2d 331, 334 (1993). The only question before us on an interlocutory appeal of this type is whether there was a sufficient showing to sustain the order of the trial court granting or denying the relief sought. *J&K Cement Construction, Inc. v. Montalbano Builders, Inc.*, 119 Ill. App. 3d 663, 667, 456 N.E.2d 889, 893 (1983). In the instant case, the record does not reflect that the trial court held an evidentiary hearing prior to entering its order, but because the facts at issue were not in dispute, such a hearing was not required. *Federal Signal Corp. v. SLC Technologies, Inc.*, 318 Ill. App. 3d 1101, 1105, 743 N.E.2d 1006, 1070 (2001). However, because there is no record of factual findings by the trial court, the decision to deny SMG's motion to compel arbitration is reviewable *de novo*. *Federal Signal*, 318 Ill. App. 3d at 1105-06, 743 N.E.2d at 1070.

■ The Uniform Arbitration Act (the Uniform Act) (710 ILCS 5/1 *et seq.* (West 1998)) empowers courts, upon application of a party showing an agreement to arbitrate, to compel or stay court action pending arbitration. 710 ILCS 5/2 (West 1998). SMG argues that the dispute in question falls within the arbitration clause in the SMG-IC agreement and, therefore, that the trial court erred in denying its motion to compel arbitration of Bass' claims. SMG contends that, although styled in tort rather than contract, Bass' claims all "regard"

the contractual relationship between SMG and IC, as required under the terms of the arbitration clause. SMG's argument centers on the assertion that Bass cannot avoid a bargained-for arbitration clause by labeling his cause of action as a tort, because his claims regard the rights, relationships and expectancies created by the agreement. In essence, SMG contends that Bass' allegations fall under the aegis of a breach of contract claim, or more specifically, a breach of the implied covenant of good faith and fair dealing claim, which Bass artfully chose not to plead in anticipation that he could escape from within the bounds of the arbitration clause.

Bass counters that he in no way contests SMG's right to terminate the agreement. Thus, he has no valid cause of action "on the agreement." Bass contends that claims regarding SMG's tortious interference with IC's contract with Shapiro and relationship with Fujita do not sufficiently relate to or fall within the scope of the SMG-IC agreement and that the plain language of the agreement shows no intent to arbitrate them. Although we recognize the potential validity of Bass' argument, under the specific facts presented here, we are persuaded that SMG is correct in claiming that Bass' counts are arbitrable.

The Uniform Act governs the interpretation and enforcement of arbitration agreements. As an initial interpretive matter, we note that our supreme court has held that judicial opinions from other jurisdictions interpreting such acts are given greater-than-usual deference since the general purpose of a uniform act is to make consistent the laws of the states that have enacted it. *Garver v. Ferguson*, 76 Ill. 2d 1, 8, 389 N.E.2d 1181, 1183 (1979). Similarly, because the Uniform Act and the Federal Arbitration Act (9 U.S.C. § 1 *et seq.* (1976)) share a common origin, courts interpreting the former look for guidance to federal court decisions interpreting similar provisions in the federal act. *J&K Cement*, 119 Ill. App. 3d at 668, 456 N.E.2d at 893.

In considering appellate review of motions to compel arbitration, our supreme court has concluded that "[t]he [Uniform] Act embodies a legislative policy favoring enforcement of agreements to arbitrate future disputes." *Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr*, 124 Ill. 2d 435, 443, 530 N.E.2d 439, 443 (1988). The court has further opined, "[i]t is a well-established principle that arbitration is a favored alternative to litigation by state, federal and common law because it is 'a speedy, informal, and relatively inexpensive procedure for resolving controversies arising out of commercial transactions.'" *Board of Managers of the Courtyards at the Woodlands Condominium Ass'n v. IKO Chicago, Inc.*, 183 Ill. 2d 66, 71, 697 N.E.2d 727, 730 (1998), quoting *J&K Cement*, 119 Ill. App. 3d at 667-68, 456 N.E.2d at 893. Wherever possible, "the courts construe arbitration awards so as to uphold their validity." *Salsitz v. Kreiss*, 198 Ill. 2d 1, 13 (2001).

■ In support of these propositions favoring arbitration, courts have generally construed "generic" arbitration clauses broadly, concluding that the parties are obligated to arbitrate *any* dispute that arguably arises under an agreement containing a "generic" provision. *J&K Cement*, 119 Ill. App. 3d at 670-71, 456 N.E.2d at 895. The particular language which courts have in the past labeled "generic" demands arbitration of either disputes "arising out of" or disputes "arising out of, or related to" the agreement at issue. *Nagle*, 244 Ill. App. 3d at 925, 613 N.E.2d at 334; *J&K Cement*, 119 Ill. App. 3d at 670, 456 N.E.2d at 895. SMG contends that the arbitration clause in the instant agreement is "generic." Bass notes, however, that the clause at issue here contains the language, "[i]n the event of any dispute, claim or controversy between the parties *regarding* this Agreement" (emphasis added). This language has not previously been considered generic by Illinois courts. While we agree with Bass that the difference in language must be evaluated, we conclude that the phrase "regarding this agreement" is not narrower in scope than the phrase "arising out of or related to" the agreement. "Regarding" is defined as "[i]n reference to; with respect to; concerning" (The American Heritage Dictionary 1095 (1981)). "Arising" is defined as "result-[ing], issu[ing], or proceed[ing]" (The American Heritage Dictionary 71 (1981)), and "related' is defined as "[c]onnected; associated" (The American Heritage Dictionary 1097 (1981)). Under these plain definitions, we find "regarding" to be at least as broad as, if not broader than, "arising" and not significantly narrower than "related." Thus, we are persuaded that precedent favoring arbitration under broad or generic clauses is instructive in this case.

We recognize, however, that alongside precedent clearly favoring arbitration among parties whose agreement shows a general willingness to arbitrate conflicts between them, exists the need for setting boundaries for that favoritism. Our supreme court has recently noted that "[w]hile arbitration is a favored method of dispute resolution, this court has consistently cautioned that an agreement to arbitrate is a matter of contract." *Salsitz*, 198 Ill. 2d at 13. As a result, "[t]he parties to an agreement are bound to arbitrate only those issues they have agreed to arbitrate, as shown by the clear language of the agreement and their intentions expressed in that language." *Salsitz*, 198 Ill. 2d at 13; *Rauh v. Rockford Products Corp.*, 143 Ill. 2d 377, 387, 574 N.E.2d 636, 641 (1991).

■ When considering a motion to compel arbitration, the court is therefore confronted with the question of whether the parties agreed to arbitrate the particular subject matter of the dispute at issue. *Donaldson*, 124 Ill. 2d at 443, 530 N.E.2d at 443. The *Donaldson* court

outlined three alternatives for courts faced with this question. First, where the language of the arbitration agreement is clear, and it is apparent that the dispute sought to be arbitrated falls within the scope of the arbitration clause, the court should decide the arbitrability issue and compel arbitration. Second, if it is apparent that the issue sought to be arbitrated is not within the ambit of the arbitration clause, the court should decide the arbitrability issue in favor of the opposing party, because there is no agreement to arbitrate. Third, where the parties are in conflict as to the scope of the provision for arbitration and the question of the parties' contractual intention as to scope is reasonably debatable, the issue of arbitrability should be initially determined by the arbitrator. *Donaldson*, 124 Ill. 2d at 445, 530 N.E.2d at 443. In reaching this holding, the *Donaldson* court instructed that, when a lack of clarity arises from questions of contract application and interpretation, the court should not deprive the party seeking arbitration of the arbitrator's skilled judgment in resolving the factual ambiguity. *Donaldson*, 124 Ill. 2d at 448, 530 N.E.2d at 444.

Under this framework, the *Donaldson* court held that a dispute over severance pay for a trader formerly employed by Donaldson, Lufkin & Jenrette Futures clearly did not fall under the mandatory arbitration clause in the rules of the Chicago Board of Trade (CBOT). However, because it was unclear whether the trader's claim for commission income arose out of the exchange business covered by the CBOT rules, arbitrability of that claim had to be determined by the arbitrator. *Donaldson*, 124 Ill. 2d at 451, 530 N.E.2d at 446. It thus appears that our task is to determine which of the three alternatives is presented in the instant case.

■ We look to several sources for guidance on this issue. First, we note that there is wide agreement among state and federal courts that the label assigned to a claim, whether it be "tort" or "contract," is not dispositive of the question of arbitrability. See, *e.g., Valero Energy Corp. v. Wagner & Brown*, 777 S.W.2d 564, 566 (Tex. Ct. App. 1989); *Breaker v. Corrosion Control Corp.*, 23 P.3d 1278, 1284 (Colo. App. 2001); *Collins & Aikman Products Co. v. Building Systems, Inc.*, 58 F.3d 16, 20-21 (2d Cir. 1995); *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999). As Texas courts have held, "[t]he focus should be on the factual allegations in the petition rather than the legal causes of action asserted." *Valero*, 777 S.W.2d at 566. The various courts to consider the arbitrability question have applied one of several standards to decide whether the alleged claims have a sufficient connection with the subject matter of the agreement to be arbitrable under its auspices. Under Texas state law, for example,

when a claim is so interwoven with the contract that it could not stand alone it is arbitrable; but it is not arbitrable if it is "completely independent of the contract and could be maintained without reference to a contract." *Valero*, 777 S.W.2d at 566. Under Florida case law, "the determination of whether a particular claim must be submitted to arbitration necessarily depends on the existence of some nexus between the dispute and the contract containing the arbitration clause." *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 638 (Fla. 1999). Likewise, a Colorado court notes that "[i]f the factual basis [of the dispute] implicates the rights and obligations created by a particular agreement," then the dispute relates to the agreement such that it must be arbitrated. *Breaker*, 23 P.3d at 1284.

Federal courts addressing the question of the scope of an agreement to arbitrate have held that the analysis "centers on whether the factual allegations underlying [the] claim *** fall within the arbitration provision." *Kiefer*, 174 F.3d at 909. The federal courts generally agree that broad arbitration clauses do not limit arbitration to the literal interpretation or performance of the contract, but embrace factual allegations in disputes between the parties which have a "significant relationship" to the contract. *American Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 93 (4th Cir. 1996); *Kiefer*, 174 F.3d at 910.

We find these assessments of the arbitrability issue, which require a substantial degree of connection between the contract and the particular claims being brought, to be cogent and consistent with Illinois courts' strong support for arbitration and careful awareness of the limits of its appropriateness. Under *Donaldson*, this analysis guides us in determining whether the instant parties' agreement to arbitrate was sufficiently clear to resolve the arbitrability question upon first hearing by the court considering the motion to compel.

■ SMG argues that Bass' claims, notwithstanding his efforts to style his allegations in tort, are significantly related to the contractual agreement containing the arbitration clause. SMG asserts that the claims both arise from the core of the contractual relationship between SMG and IC and are, in essence, a substitute for claims on the agreement that Bass might have brought, but declined to bring, in hopes of avoiding arbitration. Bass counters that his claims involve interferences with unrelated business relationships and contracts—for example, IC's employment agreement with Shapiro and IC's relationship with Fujita—and thus, there is no relationship at all between his claims and the agreement. Bass further contends that in several of the cases that address the issue, the plaintiff could have brought and did bring a contract claim against the defendant. Thus, Bass argues that

implicit in the decisions is the requirement that the tort and contract claims be interchangeable if the court is to insist on the arbitration of tort claims. In the instant case, Bass concludes that, because SMG legitimately terminated the agreement, he has no viable contract claim for which his tort claims are a substitute. Based on the particular facts at issue here, however, we find that Bass' allegations both arise out of the rights, obligations and expectancies created by the SMG-IC agreement and do, in fact, act as substitutes for a contract claim which would have encompassed the behavior alleged in all of his tort claims.

This conclusion finds support among the following state and federal cases. In *Tenet Healthcare Corp. v. Maharaj*, 787 So. 2d 241, 243 (Fla. App. 2001), a Florida court held arbitrable, under a limited partnership agreement, a doctor's claim for tortious interference with business relationships against the medical facility that fired him and took over care of his patients. The doctor did not bring any claims "on the contract." The court nevertheless held that the "agreement placed them in a unique relationship that created duties not otherwise imposed by law such that there was a sufficient nexus between the dispute and the agreement." *Tenet*, 787 So. 2d at 243. In *Valero*, a Texas court similarly held that the plaintiff's suit alleging tortious curtailment of gas purchases by defendant was arbitrable under the original purchase agreement containing an arbitration clause. *Valero*, 777 S.W.2d at 566. The *Valero* court found that the defendant's scheme to make the purchases illegal by failing to qualify as a purchaser under Texas state regulations, although tortious, was directly related to the plaintiff's rights under the purchase agreement and was therefore arbitrable. Likewise, in the instant case, Bass' expectation of receiving commissions from SMG arose from the agreement and placed him in a "unique relationship" with SMG such that there was a substantial nexus between his claims and that agreement. Furthermore, like the scheme allegedly perpetrated in *Valero*, Bass alleges a scheme to thwart the purpose of the contract under which he was deprived of his rights—commission income from SMG.

SMG directs our attention to a case squarely on point, recently decided by the Seventh Circuit. In *Kiefer*, the Seventh Circuit held that the distributor-plaintiff's claim that the supplier-defendant tortiously interfered with an employment contract the plaintiff had with an employee was arbitrable under a clause in the distributorship agreement. *Kiefer*, 174 F.3d at 910. Kiefer entered into an agreement to be a nonexclusive distributor of defendant Tarkett's product in the Kansas City market. As a requirement of that agreement, Kiefer hired Richard Rollins as its office manager. Kiefer alleged that two years into the agreement, Tarkett hired Rollins away from Kiefer to use his

connections in Kansas City to distribute its product for itself. Kiefer then sued Tarkett for breach of duty under the agreement and for tortious interference with Kiefer's employment contract with Rollins. Tarkett filed a motion to compel arbitration under the distributorship agreement. Although in *Kiefer*, unlike this case, the plaintiff did allege a contract claim, this fact was not dispositive of the issue of arbitrability. Instead, the court evaluated whether Kiefer's tort claim had a "significant relationship" to the distribution agreement and found that it did. As the court noted, "[t]he tortious interference claim *** arises from the very heart of the relationship between Kiefer and Tarkett with respect to the Kansas City market." *Kiefer*, 174 F.3d at 910. The court was persuaded that the sole underlying act at issue—Tarkett's solicitation of Rollins—which supported both tort and contract claims, was sufficiently related to the contract to be arbitrable.

Likewise, in *American Recovery*, decided by the Fourth Circuit, the court concluded that both a "tortious inducement of breach of fiduciary duty" and "tortious interference with a third-party-contract" claim were arbitrable under a consulting agreement between the plaintiff and defendant. *American Recovery*, 96 F.3d at 93-94. The case involved a consulting agreement between the parties under which American Recovery Corporation (ARC) was to assist Computerized Thermal Imaging (CTI) with their plans to install medical technology equipment in hospitals in China. The agreement included the goal of persuading certain designated engineering firms to assist in the project. Separate agreements between ARC and the designated firms contained noncircumvention clauses prohibiting the firms from negotiating with CTI except through ARC. The consulting agreement between ARC and CTI contained an arbitration clause. During the course of the project, ARC's president, Richard Secord, jumped ship and entered the employ of CTI, at which time he proceeded to negotiate a letter of intent from one of the engineering firms named in the agreement. ARC filed suit against CTI and the firms, alleging that CTI induced Secord's breach of his fiduciary duty to ARC and that CTI induced the engineering firm to breach the noncircumvention agreement. The Fourth Circuit concluded that the claims were arbitrable as "significantly relate[d] to" the original consulting agreement. *American Recovery*, 96 F.3d at 93-94.

We find both *Kiefer* and *American Recovery* instructive. As in both cases, Bass' tort claims "arise from the very heart" of the relationship between IC and SMG and are significantly related to the agreement defining that relationship. The crux of Bass' contention is that SMG schemed to circumvent the SMG-IC agreement at the moment of its greatest profitability by putting Shapiro on the payroll and dealing

with Fujita directly. In recompense, Bass seeks the commission income that IC would have received had the agreement not been terminated. Bass' own characterization of the acts at issue and his efforts to recoup the benefit of his bargain here, therefore, shows a sufficient relationship with the agreement to make his counts arbitrable.

We note that, generally, the forgoing cases all assess arbitrability via two policy-based modes of analysis. First, courts are vigilant that plaintiffs not be permitted to bring actions either solely in tort or with appended tort claims which are, in essence, substitutes for or repetitious of their contract claims for the clear purpose of circumventing arbitration clauses. For some courts, substitutability is a crucial prong of proof of arbitrability; other courts consider it dispositive but not required. The latter courts emphasize the second policy-based prong. Here, tort claims with a "significant relationship" or "nexus" with the agreement containing a broad arbitration clause are arbitrable. Under this prong, courts decide arbitrability by examining the specific links between the claims alleged and the subject matter of the agreement.

The variation among jurisdictions as to the degree of connection required, and as to the overlap of prongs one and two, need not detain us because the following analysis demonstrates that the claims in the instant case are thoroughly intermeshed with the rights and obligations created by the agreement *and* could indeed have been brought as claims "on the contract." An examination of each of Bass' specific counts is illustrative.

First, Bass' count VI, for tortious interference with business expectancy, has an unequivocally significant relationship or nexus with the agreement and under its clear terms is arbitrable. The underlying factual predicate in this count is IC's allegation that SMG wrongfully ended their relationship in order to pursue a direct deal with Fujita and this allegation and the injuries it is said to have caused are significantly related to the agreement. As an initial matter we note that the first component of this count is so intertwined with a contract action that it cannot be sustained regardless of any arbitrability question. Bass asserts that IC had a valid business expectancy that SMG would not terminate the agreement and that IC would continue to receive its commissions from SMG. In essence, Bass alleges that SMG tortiously interfered with the business expectancy that SMG itself generated through the agreement. We note, however, that as a plain matter of logic and law, just as a party cannot tortiously interfere with its own contract, likewise a party cannot tortiously interfere with the business expectancy that it created by that contract. *Douglas Theater Corp. v. Chicago Title & Trust Co.*, 288 Ill. App. 3d 880, 884, 681

N.E.2d 564, 567 (1997). Such an action is not a tort but a breach of contract. The tortfeasor must be a third party to the contractual or expectancy relationship. *Quist v. Board of Trustees of Community College District No. 525*, 258 Ill. App. 3d 814, 821, 629 N.E.2d 807, 811 (1994). To allow such claims to be litigated would invite tort law to absorb contract law. In situations such as that presented here, such litigation would render arbitration agreements a virtual nullity because plaintiffs could forgo asserting breach of contract claims and merely substitute a claim that the defendant tortiously interfered with their own contract, routinely avoiding the bargained-for arbitration agreement.

Within this count, however, Bass also claims that SMG tortiously interfered with IC's relationship with Fujita. This claim might be considered to be outside the scope of the agreement under facts different from those presented here—for instance, a claim that IC expected commissions from Fujita or brokered commissioned sales to Fujita from other suppliers who then followed Shapiro to SMG. However, the only injury Bass has alleged from any interference with IC's relationship with Fujita is the loss of commissions from *SMG* for sales of *SMG's* products. Litigation of this claim would produce the same ramifications just discussed: IC avoids the bargained-for arbitration clause by asserting a claim that, at its crux, consists of the allegation that SMG interfered with its own relationship with IC and cost IC the commission SMG itself was to pay.

Although relevant to the substitution prong, but not clearly essential to our analysis, we note here that the precise facts of SMG's alleged wrongdoing, assuming they prove to be true, raise a claim in contract for breach of an implied covenant of good faith and fair dealing. Because of the concerns just discussed, we find that when a plaintiff could have sought substantially the same relief, alleging the same facts, under a contract, as opposed to a tort theory, that plaintiff should not be permitted to plead only the tort and thus to avoid the agreement to arbitrate. Illinois recognizes a "covenant of good faith and fair dealing" in every contract as a matter of law, absent an express disavowal. *Prudential Insurance Co. of America v. Van Matre*, 158 Ill. App. 3d 298, 308, 511 N.E.2d 740, 746 (1987). As our supreme court has recently reiterated, " '[t]his principle ensures that parties do not try to take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or to do anything that will destroy the other party's right to receive the benefit of the contract.' " *Voyles v. Sandia Mortgage Corp.*, 196 Ill. 2d 288, 296, 751 N.E.2d 1126, 1131 (2001), quoting *Cramer v. Insurance Exchange Agency*, 174 Ill. 2d 513, 525, 675 N.E.2d 897, 903 (1996).

Implied covenants are generally implicated where one party to a contract is given broad discretion in performance. *Perez v. Citicorp Mortgage, Inc.*, 301 Ill. App. 3d 413, 424, 703 N.E.2d 518, 525 (1998). " 'The doctrine of good faith then requires the party vested with contractual discretion to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.' " *Perez*, 301 Ill. App. 3d at 424, 703 N.E.2d at 525, quoting *Resolution Trust Corp. v. Holtzman*, 248 Ill. App. 3d 105, 112, 618 N.E.2d 418, 424 (1993). In the case *sub judice*, both parties were vested with discretion to terminate the agreement and Bass' allegations in essence charge that SMG acted inconsistently with the reasonable expectations of the parties when it hired Shapiro and terminated the agreement.

As to Bass' next two counts, tortious interference with Shapiro's contract and tortious inducement to breach fiduciary duty, the underlying factual allegations reveal that these claims are sufficiently enmeshed in the "heart" of the agreement that they too are clearly arbitrable. SMG is alleged to have executed its tortious interference with business expectancy by inducing Shapiro to become an SMG employee and to bring the Fujita account. These are not unrelated claims involving separate actions by defendant but the specific means of implementation of the very scheme Bass so vigorously alleges. The same assessment applies to Bass' conspiracy claim, which encapsulates Bass' complaint about SMG's entire alleged scheme to avoid its contractual obligations and make the Fujita relationship less expensive.

Additionally, we find it compelling that Bass has pled no injuries other than the loss of the commission to which IC was entitled under the agreement. The complaint thus reveals that, by this lawsuit, Bass is seeking the benefit of his bargain with SMG. This injury is inextricably related to the agreement and the pursuit of it inherently implicates the subject matter of the agreement and falls within the clear scope of the arbitration clause therein. Bass apparently has no claim that IC's relationship with Shapiro or with Fujita produced income or commissions from a source other than SMG, with which SMG might have interfered, and which would not be connected to the agreement.

The heart of the matter here is SMG's alleged conspiracy to wrongfully deprive IC of the substantial commission it would have received on the expanded sales to Fujita in violation of the spirit of the brokerage agreement. We are persuaded that, consistent with federal and sister state decisions, the crux of the issue is inextricably linked with the agreement and that the counts are clearly arbitrable.

We recognize that the second federal circuit has diverged from the direction taken by other federal circuits and by the states to whose decisions we referred and held that, as a matter of law, claims of tortious interference with the contract of the plaintiff's employees are not arbitrable because they have no connection to the agreements between the plaintiffs and defendants which contain the arbitration clauses invoked. See *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 856 (2d Cir. 1987). We are nevertheless inclined to employ the situational analysis applied in the cases cited above which allows for the factual possibility of a connection rather than the more rigid categorical and formalistic approach adopted by the Second Circuit.

We turn next to a discussion of Bass' individual claims against SMG. We note that SMG filed a motion to dismiss these claims with the trial court in conjunction with its motion to compel arbitration. The trial court denied both motions. In its appellate brief, SMG discussed its contention that Bass had standing only to bring derivative claims on behalf of IC because he could not establish individual damages distinct from those suffered by IC. In his appellate brief, Bass argued that the trial court's denial of SMG's motion was not properly before this court as it had not been certified and, unlike the denial of the motion to compel, was not analogous to injunctive relief such that interlocutory review was warranted. We agree with Bass that the formal issue of whether Bass can maintain individual claims is not before us. We recognize, however, that our remand of this case to arbitration demands that we briefly visit this issue.

We note that in many jurisdictions, when a plaintiff sues both the corporate entity and the officers and directors of that corporation individually, courts will allow all the defendants to benefit from an enforceable arbitration clause although the officers and directors are not signatories of the agreement containing the clause. *Hirshfeld Productions, Inc. v. Mirvish*, 218 A.D.2d 567, 569, 630 N.Y.S.2d 726, 727 (1995). We are, however, presented with the reverse situation: Bass is the secretary-treasurer of IC but is suing in his individual capacity and is insisting that as a nonsignatory he cannot be bound by the agreement. Because the ramifications of this situation may not be directly analogous to the opposite case, we feel bound to follow the more general comments in controlling case law which hold that, to the extent that Bass may have viable individual claims against SMG, we cannot compel arbitration of those claims because Bass was not a party to the agreement. *Vukusich v. Comprehensive Accounting Corp.*, 150 Ill. App. 3d 634, 640, 501 N.E.2d 1332, 1336 (1986).

We note that our holding is not compromised by the fact that, as a result, some of Bass' claims are arbitrable while others are not. As our

supreme court has instructed, Illinois' public policy concerns that favor arbitration outweigh concerns regarding judicial economy, duplication of effort, or possibly inconsistent results. *Courtyards*, 183 Ill. 2d at 76, 697 N.E.2d at 733. However, because we must affirm the trial court's ruling that Bass' individual claims are not arbitrable, a question arises as to how the arbitration and remaining litigation should proceed. There does not appear to be any legal compulsion for the trial court to allow arbitration to proceed first. However, we note that as a matter of policy the facts in this case recommend consideration of (1) the predominance of Bass' derivative claims over any individual ones, (2) the possible inefficiency of dual proceedings, and (3) the potential effect of collateral estoppel on whichever proceeding is last to conclude. This is consistent with the general policy reflected in our decision in *Kostakos v. KSN Joint Venture No. 1*, 142 Ill. App. 3d 533, 538, 491 N.E.2d 1322, 1326 (1986):

> "Where the arbitrable and nonarbitrable issues, although severable, are also interrelated in terms a complete resolution of the dispute, the trial court may exercise its discretion and stay the entire proceeding pending arbitration. [Citations.] Moreover, where the issues and relationships are sufficiently interrelated and the result of arbitration may be to eliminate the need for the court proceedings, then the goals of judicial economy and of resolving disputes outside of the judicial forum are met." *Kostakos*, 142 Ill. App. 3d at 538, 491 N.E.2d at 1326.

We also note that under the Uniform Act, "[a]ny action or proceeding involving an issue subject to arbitration shall be stayed if an order for arbitration or an application therefor has been made under this Section or, if the issue is severable, the stay may be with respect thereto only." 710 ILCS 5/2(d) (West 1998).

We believe this course of action to be a prudent one and to be the logical development of our supreme court's recent conclusion that, in cases in which some claims are not arbitrable, arbitration agreements as to other claims must be honored so that such agreements do not become a practical nullity. *Courtyards*, 183 Ill. 2d at 74-75, 697 N.E.2d at 731-32.

## CONCLUSION

We reverse the trial court's denial of SMG's motion to compel arbitration of Bass' derivative claims and remand for proceedings not inconsistent with this opinion. We affirm the trial court's denial of SMG's motion to compel arbitration of Bass' individual claims.

Affirmed in part and reversed in part.

BURKE, P.J., and CAHILL, J., concur.