SECOND DIVISION
March 27, 2007

No. 1-06-2357

| | | |
|---|---|---|
| ROYAL INDEMNITY COMPANY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | Honorable |
| CHICAGO HOSPITAL RISK POOLING | ) | Diane J. Larsen, |
| PROGRAM, | ) | Judge Presiding. |
| Defendant-Appellee. | ) | |

JUSTICE SOUTH delivered the opinion of the court:

Plaintiff, Royal Indemnity Company (Royal), appeals a decision of the circuit court of Cook County which granted defendant Chicago Hospital Risk Pooling Program's (CHRPP) motion to compel arbitration. Pursuant to Supreme Court Rule 307(a)(1) (188 Ill. 2d R. 307(a)(1)), plaintiff brought this interlocutory appeal, arguing it was not a party to a trust agreement that was entered into between CHRPP and certain participating hospitals.

CHRPP is an Illinois trust that was established in 1978 by a group of Chicago-area non-profit community hospitals pursuant to the Illinois Religious and Charitable Risk Pooling Trust Act (215 ILCS 150/1 *et seq.* (West 2004)) as a charitable risk pooling trust to provide self-funded coverage of malpractice liabilities to its member hospitals. Under the trust agreement, several Chicago hospitals combine their individual assets to share the risks and burdens of self-insurance against potential medical malpractice claims. The trust agreement, which is at the center of this

controversy, was entered into by the participating hospitals, one of which is Palos Community Hospital (Palos), the trustees, who are either officers, directors or full-time employees of one of the participating hospitals, and the independent corporate fiduciary, which is the Continental Illinois National Bank and Trust Company of Chicago or any other recognized independent bank appointed by the trustees. Royal was an excess and surplus claims insurance carrier that provided medical professional liability coverage in excess of the primary liability coverage provided to Palos under the trust agreement. The excess insurance coverage provided by Royal was $5 million in excess of the $5 million layer provided by CHRPP.

A medical malpractice action was filed against Palos, two of its physicians, and members of its staff regarding the delivery and care of an infant born on March 5, 1985. That action, known as "The Donahue Action," alleged that as a proximate result of the actions of Palos, its physicians, and employees, the infant, Daniel Donahue, suffered "severe and permanent disabilities including, but not limited to, brain damage, blindness, severe lack of gross motor function control, and daily seizures, requiring daily professional care." Pursuant to the trust agreement, CHRPP retained counsel to represent Palos and its agents in the Donahue action. That counsel investigated Palos' defense and potential damages and concluded that the hospital's liability exposure for the Donahue action would likely exceed CHRPP's $5 million primary coverage. The recommendation was to settle the matter within that layer of coverage before the matter proceeded to trial, but allegedly CHRPP did not follow that recommendation, and the matter proceeded to trial in 2002. Once trial commenced, the attorney for the Donahue matter refused to settle within the primary coverage layer. Before a verdict was rendered in the case, a

settlement agreement was reached in the amount of $18 million, and CHRPP became liable for its entire $5 million layer of primary liability coverage, Royal became liable for its entire $5 million layer of excess liability coverage, and the remaining $8 million was paid by another excess carrier which provided second layer excess coverage to Palos for liabilities exceeding $10 million.

On April 6, 2006, Royal filed a one-count first amended complaint, alleging CHRPP breached its good-faith duty to settle the Donahue action. Specifically, the first amended complaint alleged that CHRPP was made aware by its hired counsel and Royal that Palos' liability exposure was likely to exceed its $5 million layer of coverage, and that CHRPP knew or should have known that the matter could have been settled within that layer but refused to do so. Additionally, the first amended complaint alleged that approximately two weeks after the trial commenced, CHRPP still refused to settle, despite being informed by hired counsel that the case was a "dead bang loser," and ignored the admonishments until it was too late. According to the first amended complaint, once CHRPP agreed to settle the matter, counsel for the Donahue matter demanded no less than $18 million, which caused Royal to be liable for its entire $5 million layer of excess liability coverage.

In response, CHRPP filed a motion to compel arbitration of the complaint on the grounds that Royal's excess policy was a "following form" policy in that it adopted and incorporated the terms of the underlying coverage, *i.e.*, the trust agreement which established Palos' $5 million self-insured coverage with CHRPP. Royal opposed the motion on the grounds that the trust agreement was entered into solely between CHRRP and Palos and did not apply to any claims

1-06-2357

between Royal and CHRPP, and CHRPP's duty to Royal arose independent of any language within the trust agreement.

On July 27, 2006, the trial court granted defendant's motion to compel. Royal timely filed its notice of interlocutory appeal pursuant to Illinois Supreme Court Rule 307(a) (188 Ill. 2d R. 307(a)).

The sole issue before us is whether a nonsignatory to an arbitration agreement can be compelled to arbitrate a claim pursuant to that agreement.

We note at the outset that even though this is not an appeal from a final order, we have jurisdiction over this interlocutory order under Rule 307(a) since a motion to compel arbitration is analogous to a motion for injunctive relief. Nagle v. Nadelhoffer, Nagle, Kuhn, Mitchell, Moss & Saloga, P.C., 244 Ill. App. 3d 920, 924 (1993). A denial or grant of that motion can be reviewed by an appellate court as an interlocutory appeal pursuant to Supreme Court Rule 307(a)(1). 188 Ill. 2d R. 307(a)); Yandell v. Church Mutual Insurance Co., 274 Ill. App. 3d 828, 830 (1995). The only question before us on an interlocutory appeal of this type is whether there was a sufficient showing to sustain the order of the trial court granting or denying the relief sought. J&K Cement Construction, Inc. v. Montalbano Builders, Inc., 119 Ill. App. 3d 663, 667 (1983). The trial court did not hold an evidentiary hearing in this case and or make any factual findings. Furthermore, none of the relevant underlying facts are in dispute. Rather, the court's decision was based on a purely legal analysis. Thus, we review the trial court's denial of the motion to compel arbitration *de novo*. Hutcherson v. Sears Roebuck & Co., 342 Ill. App. 3d 109, 115 (2003); Bass v. SMG, Inc., 328 Ill. App. 3d 492, 496 (2002).

- 4 -

1-06-2357

The trust agreement's provision at issue on this appeal is contained within section 6.21 of that agreement, which states in relevant part:

"The Trustees shall devise a policy to govern the settlement of claims against a Hospital for Coverage Losses ***. The policy so devised shall provide for consultation with a representative of said Hospital involved and, where appropriate, the defense counsel selected pursuant to Section 6.18, before any settlement is approved, and further shall provide that any settlement shall require the concurrence of both a majority of the Trustees and the Hospital. *** *In the event that any Hospital and the Trustees are unable to concur in a settlement, and the Trustees conclude that said inability is to the detriment of the Participating Hospitals, said settlement dispute shall be subjected to arbitration by an ad hoc committee to be composed of three Trustees who are representatives of the participating hospitals appointed by the Chairman of the Trustees. The decision reached by said ad hoc committee shall be final and not subject to attack in any court of law or equity, either directly or collaterally.*" (Emphasis added.)

While the parties do not dispute that Royal did not actually sign the trust agreement, CHRRP directs our attention to item 3 on the declarations page of Royal's excess policy, which states that the coverage to be provided was "Straight Excess *Following Form* Hospital

- 5 -

Professional Liability and Comprehensive General Liability." (Emphasis added.) Additionally, CHRPP directs our attention to item 5 of the declarations page of Royal's excess policy which identifies the company providing the underlying policy and limits as the "Sixth Amended Trust Agreement, as per copy on file with company." By placing that language in its excess policy, CHRPP contends, Royal was incorporating the trust agreement in its entirety, including section 21 of article 6, which relates to arbitration and dispute resolutions.

In response, Royal argues that the "following form " language on its declarations page relates solely to "coverage," which is addressed exclusively in articles IV and V of the trust agreement, and that while it follows the form of those two articles, it does not follow the form of the remaining 13 articles of the 15-article agreement. Royal draws this court's attention to the fact that article IV of the trust agreement pertains to "Coverages and Exclusions," and article V pertains to "Limitations and Deductibles," as opposed to article VI, which pertains solely to the "Powers, Rights and Duties of the Trustees."

In construing an insurance policy, the court's primary function of is to ascertain and enforce the intention of the parties as expressed in the agreement. CILCO v. Home Insurance Co., 342 Ill. App. 3d 940, 950-51 (2003). "The court must construe the policy as a whole, taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purposes of the entire contract." CILCO, 342 Ill. App. 3d at 951.

Royal's excess policy contains "following form " language. "Following form" is a term used in the insurance industry to describe the type of policy wherein an excess carrier policy

insures the same risk covered by the underlying policy. When a policy uses "following form " language, the excess carrier is bound by the underlying coverage language. See Hartford Accident & Indemnity Co. v. Chicago Housing Authority, 12 F. 3d 92, 95-96 (7th Cir. 1993). In Hartford, the excess liability policy stated:

> "Except as otherwise provided by this policy, the insurance afforded herein shall follow *all the terms, conditions, definitions and exclusions of the controlling underlying insurance policy* designated in Item 6 of the declarations." (Emphasis added.)
> Hartford, 12 F.3d at 95.

In McMillian v. Coating Specialists Inc., 427 F. Supp. 54 (E.D. La. 1976), the court held that because the contracting of a disease by the insured's employee was not an insurable event for the primary carriers, the excess carriers could not be found liable based upon the "following form" provision in the excess policy, which stated that the policies "are expressly subject to the same 'terms and conditions' as the primary insurance." 427 F. Supp. At 56.

In Riunione Adriatic Di Sicurta v. Checker Taxi Cab Co., No. 90 C 1680 (N.D. Ill. 1991) (not reported in F. Supp.), a dispute arose over whether plaintiff, Adriatic Insurance, was liable to defendant under the terms of its excess liability insurance policy despite the insolvency of two of defendant's underlying insurance providers. In finding that it was liable, the court noted that Adriatic's excess policy contained a provision which made its liability subject to the "conditions, agreements, exclusions and limitations" of the underlying policies irrespective of the solvency or insolvency of the underlying carriers, and if those carriers were liable under the conditions set

forth in their policies, so was Adriatic. <u>Riuione Adriatic Di Sicurta</u>, No. 90 C 1680 at 4.

We conclude that the "following form" language used in Royal's excess policy refers solely to the coverage and risks which plaintiff agreed to insure and nothing more. Specifically, the declarations page of the excess policy states that as to coverage, it is "straight excess following form hospital professional liability and comprehensive general liability." Unlike in <u>Hartford</u>, <u>McMillian</u>, and <u>Riuione</u>, it does not contain language that it is subject to "all" of the terms and conditions of the underlying primary insurance, which is a very critical distinction. The excess policy's following form language refers solely to coverage, and, as such, follows the form of articles IV and V of the trust agreement, which deal exclusively with coverage.

Article VI, on the other hand, which contains the arbitration agreement, pertains exclusively to the powers, rights, and duties of the trustees. For example, the trustees have the right to establish a line of credit, enter into contracts, sell, convey, transfer, and otherwise dispose of all or any part of the Fund property, defend lawsuits brought against a hospital alleging a covered loss, retain attorneys to defend those lawsuits, and have the sole and exclusive right to appeal an adverse judgment. These are just a few of the powers, duties, and rights discussed in article VI. However, none of the provisions in article VI touch upon the issue of coverage. Were we to accept defendant's reasoning that Royal's following form language makes it, as the excess carrier, subject to all of the terms, conditions, and provisions of the trust agreement, including article VI and its arbitration section, we would then be required to hold that Royal has the concomitant right or duty, for example, to sell or dispose of the Fund property, retain counsel on lawsuits, or determine whether an adverse judgment should be appealed. Such an absurd result

could not have been the intent by the excess carrier.

Defendant maintains, however, that in addition to using the "following form" language, the excess policy specifically adopts the sixth amended trust agreement in its entirety because it identifies the underlying coverage or company as the "Sixth Amended Trust Agreement, as per copy on file with company." However, simply identifying the company or underlying coverage as the trust agreement does not constitute clear and unequivocal language that Royal intended to incorporate all of the terms and provisions of that agreement. There needs to be additional language in the excess policy that Royal, as the excess carrier, was adopting all of the terms, provisions, and conditions of the trust agreement in addition to the coverage conditions. However, that language does not appear anywhere on the declarations page of the excess policy and cannot be read into it.

Defendant has raised the argument that an arbitrator, not the court, must determine the question of whether Royal is required to arbitrate its claim.

The Uniform Arbitration Act (710 ILCS 5/1 *et seq*. (West 2004)) embodies a legislative policy favoring enforcement of agreements to arbitrate future disputes. Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr, 124 Ill. 2d 435, 443 (1988). Accordingly, the Act empowers the circuit court, upon application of a party to a dispute, to compel or stay arbitration, or to stay court action pending arbitration. United Cable Television Corp. v. Northwest Illinois Cable Corp., 128 Ill. 2d 301, 306 (1989). Arbitration is regarded as an effective, expeditious, and cost-efficient method of dispute resolution. United Cable, 128 Ill. 2d at 306. However, while arbitration is a favored method of dispute resolution, our supreme court has consistently

cautioned that an agreement to arbitrate is a matter of contract, and the parties to an agreement are bound to arbitrate only those issues they have agreed to arbitrate, as shown by the clear language of the agreement and their intentions expressed in that language. Salsitz v. Kreiss, 198 Ill. 2d 1, 13 (2001); Bass v. SMG, Inc., 328 Ill. App. 3d 492, 506 (2002). Persons who are not parties to an arbitration agreement cannot be compelled to arbitrate. City of Peru v. Illinois Power Co., 258 Ill. App. 3d 309, 313 (1994).

"[W]here the parties are in conflict as to the scope of the provision for arbitration and the question of the parties' contractual intention as to scope is reasonably debatable, the issue of arbitrability should be initially determined by the arbitrator." Bass, 328 Ill. App. 3d at 499. This heavy presumption in favor of arbitrability, however, does not apply to the issue of which claims are arbitrable, and courts should not assume that the parties agreed to arbitrate. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 131 L. Ed. 2d 985, 115 S. Ct. 1920 (1995). While parties can agree to let an arbitrator determine the scope of his own jurisdiction and decide which disputes the parties had agreed to arbitrate, such an intention must be clearly and unmistakably unambiguous. AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 649, 89 L. Ed. 2d 648, 656, 106 S. Ct. 1415, 1418 (1986). Thus, the general rule is that whether particular disputes are arbitrable under a contractual arbitration clause are questions for the court to decide as a matter of contract interpretation. Virginia Carolina Tools, Inc. v. International Tool Supply, Inc., 984 F.2d 113, 117 (4th Cir. 1993).

In the instant case, the issue is whether Royal agreed by the express terms of its excess policy that it was to be bound by the arbitration clause contained in the trust agreement. We

conclude that this question is one for the court to decide, not an arbitrator.

In conclusion, we find that Royal's use of  following form language in its excess policy applied solely to coverage and did not constitute an agreement or expression of its intent to be bound by the arbitration clause contained in the trust agreement.  We further find that Royal's identification of the underlying policy as the trust agreement was not a clear and unquivocable expression of its intent to incorporate the entire agreement and that, therefore, as a nonsignatory to the arbitration agreement, it cannot be compelled to arbitrate its claim against CHRPP pursuant to that agreement.

Accordingly, we hold that the trial court erred in granting defendant's motion to compel arbitration and reverse and remand the matter for further proceedings consistent with this opinion.

Reversed and remanded.

HOFFMAN and HALL, JJ., concur.