In the

# United States Court of Appeals
## For the Seventh Circuit

No. 17-3366

JOHN HEIMAN and JTE, INC.,

*Plaintiffs-Appellants*,

*v.*

BIMBO FOODS BAKERIES DISTRIBUTION CO., f/k/a BESTFOODS BAKING DISTRIBUTION CO.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17 C 4065—**Manish S. Shah**, *Judge*.

ARGUED APRIL 18, 2018 — DECIDED AUGUST 30, 2018

Before WOOD, *Chief Judge*, and FLAUM and EASTERBROOK, *Circuit Judges*.

WOOD, *Chief Judge*. From 2000 to 2011, John Heiman, first individually and later through his company, JTE, Inc., distributed products for Bimbo Foods Bakeries Distribution Company throughout suburban Chicago. Bimbo Foods (pronounced "Beembo") sells baked goods under a number of familiar brand names, such as Brownberry. The distribution

agreement between JTE and Bimbo Foods had no fixed duration, but it could be terminated in the event of a non-curable or untimely cured breach by one of the parties. The agreement specified that New York law would govern all claims and disputes. Although the partnership between Bimbo and JTE proceeded swimmingly for a number of years, it met a calamitous end.

According to JTE's complaint, which we must accept as true for purposes of this appeal, Bimbo Foods began fabricating curable breaches in the spring of 2008 as part of a scheme to force JTE out as its distributor. Bimbo Foods employees filed false reports of poor customer service and out-of-stock products at stores in JTE's distribution area. Even more egregiously, Bimbo employees would sometimes remove JTE-delivered products from grocery store shelves, photograph the empty shelves as "proof" of a breach, and then return the products to their initial location. On one occasion, in 2008, a distributor caught a Bimbo Foods manager in the act of fabricating a photograph and reported him. Bimbo assured JTE that this misconduct would never happen again. Nevertheless, unbeknownst to JTE, Bimbo Foods continued these scurrilous tactics. Its goal was to force JTE to forfeit its distribution rights so that Bimbo Foods could install a new distributor that would take a smaller slice of the proceeds: 18 percent as compared to JTE's 22 percent. When JTE refused to sell its distribution rights in January 2011, Bimbo Foods breached the distribution agreement and unilaterally terminated JTE's agreement, citing the fabricated breaches as cause. Several months later, in September and October 2011, Bimbo Foods forced JTE to sell its rights to new distributors.

Despite the long run-up to its loss of the contract, JTE tells us that it did not learn about Bimbo Foods's scheme to fabricate breaches until late 2013 or early 2014. When Heiman and JTE finally did sue Bimbo Foods in the Northern District of Illinois on May 30, 2017, they alleged two claims: breach of contract and tortious interference. The district court never reached the substance of those claims, however, because Heiman and JTE ran into two procedural problems. First, in a decision that Heiman does not contest on appeal, the district court ruled that Heiman could not sue Bimbo Foods individually because he was not party to the distribution agreement and thus was not a "real party in interest," as required by Federal Rule of Civil Procedure 17. Only JTE, the court said, could advance breach-of-contract and tortious-interference claims based on the distribution agreement. We refer from this point onward only to JTE, in keeping with this ruling. Second, the district court found that both claims were stale under the applicable statutes of limitations and consequently dismissed JTE's suit under Federal Rule of Civil Procedure 12(b)(6). On appeal, JTE contends that the district court applied the wrong statute of limitations for the breach-of-contract claim and failed to give it the benefit of the discovery rule for the tortious-interference claim.

## I

We begin with JTE's breach-of-contract claim. Because this is a diversity suit arising under state law, see 28 U.S.C. § 1332(a), our first task is to determine which state supplies the statute of limitations. *Guaranty Tr. Co. of N.Y. v. York*, 326 U.S. 99, 107 (1945). There are two possible candidates: Illinois, the forum state, and New York, the state specified by the choice-of-law clause in the distribution agreement.

We look to the choice-of-law rules of the forum state to determine which state's law applies. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). While Illinois honors express choice-of-law provisions in contracts for purposes of determining substantive legal rights, *Hartford v. Burns Int'l Servs., Inc.*, 172 Ill. App. 3d 184, 187 (1988), Illinois law—unlike federal law—considers statutes of limitations to be procedural issues governed by the law of the forum. *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 707 (7th Cir. 2004); *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 351–52 (2002). Illinois imposes a ten-year statute of limitations for breach of written contracts, "[e]xcept as provided in Section 2-725 of the 'Uniform Commercial Code,'" which governs the sale of goods. 735 ILCS 5/13-206; 810 ILCS 5/2-102. JTE runs into trouble with this exception, which provides that an "action for breach of any contract for sale [of goods] must be commenced within 4 years after the cause of action has accrued." 810 ILCS 5/2-725. The parties agree that JTE's breach-of-contract claim accrued no later than the time of the final sale: October 21, 2011. Thus, if the distribution agreement is a contract for the sale of goods, then JTE's case was filed years too late; but if the distribution agreement is instead a contract for services, then the case was filed well within the permitted time.

The parties disagree on how we ought to analyze this question. JTE argues that while the statute of limitations is procedural, the question whether the distribution agreement is a contract for the sale of goods is a substantive question of contract interpretation that must be resolved under New York law. In other words, according to JTE, we must look to New York law to determine whether the contract is a "contract for sale" for purposes of Illinois law. JTE's theory is misguided.

In fact, the Supreme Court case on which JTE relies does not help it. According to JTE, the Supreme Court in *Bank of United States v. Donnally*, 33 U.S. 361 (1834), looked to Kentucky law to determine the type of agreement before it for purposes of determining the applicable statute of limitations in Virginia. But the Court did just the opposite:

> If, then, it were admitted, that the promissory note now in controversy, were a specialty by the laws of Kentucky, still it would not help the case, unless it were also a specialty, and recognised as such, by the laws of Virginia; for the laws of the latter must govern as to the limitation of suits in its own courts, and as to the interpretation of the meaning of the words used in its own statutes.

*Id*. at 372–73. Although *Donnally* is an old case concerning different states and different laws, the Supreme Court's intuition remains accurate. The question whether a distribution agreement is a "contract for sale" is not one of contract interpretation, but one of statutory interpretation. Illinois courts have interpreted their state's statute to mean that a contract is a "contract for sale" subject to the UCC's four-year limitations period if the contract "is predominately for goods with services being incidental, rather than predominately for services with goods being incidental." *Zielinski v. Miller*, 277 Ill. App. 3d 735, 741 (1995). And Illinois applies its own law in making that determination, even in the face of an express choice-of-law provision adopting the substantive law of a different state. *Belleville Toyota*, 199 Ill. 2d at 351–52. Issues of contract interpretation might arise as part of the overarching inquiry — for example, if it is unclear what one provision means and the

ambiguity would tip the goods-services balance—but determining what test to apply is a statutory question, not a contractual one.

Even if JTE could succeed in its attempt to graft New York law into the statute of limitations inquiry (and it cannot), the outcome would be no different. Just as Illinois courts do, courts in New York "look[] to the 'primary purpose' test to determine which statute of limitations applies to the entire contract." *Cary Oil Co., Inc. v. MG Refining and Mktg., Inc.*, 90 F. Supp. 2d 401, 407 (S.D.N.Y. 2000); *Levin v. Hoffman Fuel Co.*, 462 N.Y.S.2d 195, 196 (App. Div. 1983) ("[T]he test established by controlling authority is whether the agreement is 'predominantly' one for the sale of goods or for the providing of services.").

Under the primary-purpose test, the distribution agreement between JTE and Bimbo Foods easily qualifies as a contract for the sale of goods. We have previously pointed out that "virtually every jurisdiction that has addressed this issue" has concluded that dealership and distributorship agreements are "predominantly for the sale of goods." *Am. Suzuki Motor Corp. v. Bill Kummer, Inc.*, 65 F.3d 1381, 1386 (7th Cir. 1995). Illinois and New York are among these jurisdictions. See *Belleville Toyota*, 199 Ill. 2d at 353 (citing New York case law as persuasive). JTE has not explained how or why its contract with Bimbo Foods is distinguishable from the contract at issue in *Belleville Toyota*. True, JTE agreed to provide a significant amount of services under the Agreement, but as in *Belleville Toyota*, all of the service provisions are incidental to the larger purpose of the contract, which is to sell goods to consumers. *Id.* at 353–54. Because the agreement qualifies as a "contract for sale" of goods under Illinois law, it is governed

by the UCC's four-year statute of limitations and not by the ten-year period for other written contracts. JTE's breach-of-contract claim is untimely.

## II

JTE's tortious-interference claim fares no better. Here, the battle between the parties is not over the proper limitations period (they agree that it is five years per 735 ILCS 5/13-205), but rather over the accrual date. JTE argues that under Illinois's fraud-discovery rule, its claim did not accrue until it discovered the full extent of Bimbo Foods's wrongdoing in early 2014. See *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 77–79 (1995) (explaining that the discovery rule "delays the commencement of the relevant statute of limitations until the plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused" (quoting *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 158 Ill. 2d 240, 249 (1994))). Bimbo Foods responds that because JTE claims to have known Bimbo's allegations of breach were false in 2011, it cannot take refuge in the discovery rule.

Bimbo is correct. Although JTE's complaint states that it did not know the extent of Bimbo Foods's nefarious plan until early 2014, JTE admits to knowing in 2011 that (1) a district manager for Bimbo Foods removed products from store shelves to lodge a false complaint about JTE's service, (2) JTE was "substantially perform[ing] its obligations" at the time of the breach, and (3) all of the breaches alleged by Bimbo were false. In other words, JTE "is not really disputing that it was 'aware of the possibility that [it] had been wrongfully injured'" as of the injury date, but is arguing only that "it could not be sure." *Vector-Springfield Properties, Ltd. v. Central Ill.*

*Light Co., Inc.*, 108 F.3d 806, 809 (7th Cir. 1997) (quoting *Hermitage*, 166 Ill. 2d at 84). This is not enough to take advantage of the discovery rule. By the time JTE was injured by the notice of breach and forced sale, it knew that Bimbo Foods had subjected it to "wrongful conduct." JTE did not know at the time which precise misdeeds were involved—they could have been a simple breach of contract, or tortious misconduct, or something else—but Illinois does not require that sort of specificity. "[S]ome indication of wrongdoing" is enough to prevent application of the discovery rule, whose application is reserved for "cases where the relationship between the injury and the alleged wrongful conduct is obscure." *Newell v. Newell*, 406 Ill. App. 3d 1046, 1051 (2011). Unlike in cases with more opaque links between injury and wrongful conduct, it is apparent in this case that JTE "knew or should have known of the existence of the right to sue the defendant at the time of the [breach]." *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 365 (1995). JTE should not have "slumber[ed] on [its] rights" until it determined the exact way in which it was harmed. *Nolan v. Johns-Manville Asbestos*, 85 Ill. 2d 161, 171 (1981).

Although not raised by the parties, an additional defect in JTE's tortious interference claim also dooms its case: under Illinois law, as is true in most states, "a party cannot tortiously interfere with its own contract," nor can it tortiously interfere with any business expectancies created by that contract. *Bass v. SMG, Inc.*, 328 Ill. App. 3d 492, 503 (2002). As the Illinois courts have noted, "[t]o allow such claims to be litigated would invite tort law to absorb contract law." *Id*. at 504. Thus, JTE's claim for tortious interference fails not only for untimeliness, but also on its merits.

We AFFIRM the judgment of the district court.