In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 22-1290

NICOLE BRONSON,

*Plaintiff-Appellant*,

*v.*

ANN & ROBERT H. LURIE CHILDREN'S
HOSPITAL OF CHICAGO and
SUSAN RUOHONEN,

*Defendants-Appellees*.

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 20-c-2077 — **John Z. Lee**, *Judge*.

---

ARGUED SEPTEMBER 29, 2022 — DECIDED MAY 30, 2023

---

Before SYKES, *Chief Judge*, and ROVNER and JACKSON-AKIWUMI, *Circuit Judges*.

ROVNER, *Circuit Judge*. Nicole Bronson has sued Ann & Robert H. Lurie Children's Hospital of Chicago ("Lurie" or "the hospital") and Susan Ruohonen, Lurie's Director of Family Services, for race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and section

1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981. She also brought two state law claims for tortious interference with contract and defamation. The district court dismissed the Title VII and section 1981 claims along with the tortious interference claim and remanded the remaining defamation claim to state court. *Bronson v. Ann & Robert H. Lurie Children's Hosp. of Chicago*, 2021 WL 1056847 (N.D. Ill. Mar. 18, 2021). Bronson appeals, and we affirm.

## I.

We accept the following allegations of Bronson's complaint as true for purposes of reviewing the district court's decision to dismiss the complaint.

In August 2018, Chicago Public Schools ("CPS") Manager Tora Evans hired Bronson as a citywide hospital and treatment center teacher. R. 1 ¶¶ 9, 27.[1] Bronson was assigned to Lurie for a period of three years. ¶ 9. Lurie is a pediatric hospital—the largest provider of pediatric health services in the Chicago metropolitan region. ¶ 2. Bronson was one of three CPS teachers assigned to work at the hospital. ¶ 14. Bronson and one other teacher, Catherine Cooper, are Black; the third teacher, Barbara Lee, is White. ¶¶ 1, 14. Ruohonen, as Lurie's family services director, served as the teachers' "representative supervisor" at the hospital. ¶¶ 11, 29. Ruohonen is White. ¶ 11. Only one percent of the hospital employees who worked under Ruohonen's supervision were Black. ¶ 11.

As a hospital teacher, it was Bronson's job to provide educational services to students who were unable to participate

---

[1] Unless otherwise indicated, all record citations are to the allegations set forth in Bronson's complaint.

in classroom instruction because of a diagnosed medical or psychiatric condition requiring in-patient treatment at Lurie. ¶¶ 12, 13, 17. Among other responsibilities, Bronson was required to assess a student's eligibility for instruction, determine what educational resources were available for that student, prepare a case management plan, obtain parental consent for the student to receive educational services from hospital-assigned teachers, and also have a physician or advanced practice nurse complete certain paperwork. ¶¶ 12, 13, 17. In collaboration with the student's classroom teacher(s), Bronson created a lesson plan that was consistent with a student's educational needs as well as his or her medical condition. ¶¶ 12, 13. She would then provide instruction to the hospitalized student, either individually at bedside or in small-group settings. Bronson also maintained records for all students and prepared regular, detailed reports on their progress. ¶¶ 12, 13, 17.

Because Bronson was working directly with patients in a hospital setting, Lurie controlled her access to the hospital premises, to patient medical records, and to the patients themselves; supplied her with workspace; trained her on pertinent hospital policies and procedures, as it did with other hospital employees; and monitored her compliance with those policies and procedures. ¶¶ 10, 18–20, 22–24, 30–31. Bronson was issued a Lurie identification badge that gave her access to the hospital and a hospital pager and email account to facilitate and coordinate her access to patients. ¶ 10. She was also given an office on the hospital premises that she shared with the other two teachers assigned to Lurie. ¶¶ 39–40, 43. In addition to a general orientation, Bronson's training at the hospital included instruction regarding patient privacy, including the patient confidentiality provisions of the Health

Insurance Portability and Accountability Act of 1996 ("HIPAA"), P.L. 104–191, 100 Stat. 2548 (Aug. 21, 1996). ¶ 35. Ruohonen was Lurie's agent—and Bronson's representative supervisor—in all of these respects. ¶¶ 11, 19, 21, 24, 28, 30, 39, 41, 45, 48, 54.

The gist of Bronson's complaint is that from the beginning, Lurie and Ruohonen treated Bronson and Cooper, the first Black teachers who served at Lurie, in a discriminatory manner. Bronson alleges that Lurie staff, including Ruohonen in particular, took actions that made it more difficult for them to do their jobs, ostracized and demeaned them, subjected them to a hostile working environment, and attempted to have CPS discipline and/or remove them from Lurie. ¶¶ 16, 19–24, 26, 28, 33–35, 37–39, 44, 48, 51, 54.

In a departure from its consistent past practice with other CPS teachers, Lurie denied Bronson and Cooper access to the hospital's electronic medical records system, known as EPIC. ¶¶ 19–21. Among the data stored in the EPIC system is information concerning a student-patient's hospital admission and discharge dates, medical diagnosis, and medical providers. ¶ 18. Teachers need this type of information in order to secure consent to work with a student and to prepare and implement an appropriate educational plan. ¶¶ 17–18. The predecessors of Bronson and Cooper had all been granted access to EPIC; Bronson and Cooper were the first and only teachers at Lurie who had been denied such access. ¶¶ 15, 23. Without the ability to use EPIC, Bronson and Cooper found it much more difficult to gain access to hospitalized students. ¶¶ 19–20. It would take Bronson and Cooper as long as two to three days to obtain the requisite information through other means and to secure the parental consent and other authorizations

required of them. In some instances, a student might be discharged from the hospital before the teachers finally had assembled the information and paperwork they needed to begin providing services to the student. ¶ 25. When Bronson queried Ruohonen as to why they were shut out of the EPIC system, Ruohonen replied that allowing them access to patient records would constitute a HIPAA violation. When Bronson pointed out that their predecessors had been given access to EPIC, Ruohonen advised Bronson that it was a "new policy" to exclude teachers from the system. ¶¶ 19, 24. All CPS teachers at Lurie were required to undergo training with respect to HIPAA and patient confidentiality, but even after completing that training, Bronson and Cooper continued to be treated as outsiders. ¶ 35. Bronson raised the issue repeatedly with Ruohonen, explaining to her the difficulty that the lack of access to records was causing, but to no avail. ¶¶ 19, 21, 24. For her part, Ruohonen emailed Evans, Bronson's CPS supervisor, questioning why Bronson needed information concerning a student's admission and discharge dates. ¶ 27.

The identification badges that Lurie issued to Bronson and Cooper bore a different color than those issued to other workers at Lurie—indeed, different from those that previously had been issued to other CPS teachers assigned to Lurie, including their colleague Barbara Lee, who is White. ¶ 30. Lee was on parental leave in August 2018 when Bronson and Cooper were first assigned to Lurie. ¶ 14. When Lee returned to the hospital following her leave in March 2019, Cooper immediately noticed the difference in badge colors. It also came to light that Lee's badge granted her "regular employee access" to the EPIC medical records system. (The badges were used both for general identification purposes and to access Lurie computers.) Bronson and Cooper began asking questions

about the disparity. A few days later, Ruohonen's assistant sent an email asking all CPS teachers to check the color of their badges. At that point, Lee was instructed to turn in her badge and pick up a new one that was the same color as those issued to Bronson and Cooper. ¶ 30.

Not until September 2019, more than a year after Bronson first started work at Lurie, was she given any access to the EPIC medical records system. Bronson discovered the change when she swiped her badge on a Lurie computer in order to check her email and noticed that she was now being provided limited access to EPIC. ¶ 31. At no time did Lurie otherwise notify Bronson that she had been granted such access. ¶ 32.

In the meantime, the relationship between Ruohonen and Bronson and Cooper had deteriorated. ¶¶ 21, 26, 33, 37. Ruohonen avoided contact with the two teachers, delegating to her administrative assistant the responsibility for providing certain training and orientation to Bronson and Cooper, although the assistant herself was unable to answer many of their questions and admitted that she did not know why Ruohonen was having her train them when she lacked the experience necessary to do so. ¶ 22. During a photography session at Lurie held in preparation for upcoming events marking Teachers Appreciation Week, Ruohonen posed for photographs with other school services workers, but when it was time for Cooper and Bronson to have their picture taken, Ruohonen announced she had somewhere else to be and excused herself from the photo, which caused them to feel disrespected and humiliated in front of their peers. ¶ 38.

Ruohonen was not the only person at the hospital who treated Bronson and Cooper in an allegedly demeaning manner. On one occasion, Bronson arrived at a student-patient's

room for a scheduled teaching session. A nurse followed Bronson into the room and, in front of the student-patient and her grandmother, asked whether Bronson "could read." The grandmother intervened and remarked that she did not want that kind of discussion going on in front of her granddaughter and that the teaching appointment could be rescheduled for another time. ¶ 33. Bronson attempted to discuss the incident with the nurse and thought the matter was resolved. Shortly thereafter, however, Ruohonen sent an email to Evans reporting that a parent had issued a complaint against Bronson. A meeting was then convened among Bronson, Cooper, Evans, and the nurse, wherein it emerged that the report of a parental complaint was false. ¶ 34.

On February 26, 2019, Ruohonen sent an email to Evans, their CPS supervisor, complaining that Bronson and Cooper: spent a good deal of time in their office and did not interact with other hospital workers; displayed attitudes that were perceived as passive-aggressive, dismissive, and "better than others"; exhibited annoyance when a patient was unavailable; were "[n]ot really committed to their service to our patients"; and in general did not reflect the culture at Lurie. ¶ 28. That email prompted Bronson to contact the Chicago Teachers Union, which led to a stern response to Ruohonen from Leah Raffanti, their CTU field representative. After identifying herself as such, Raffanti admonished Ruohonen as follows:

> The CTU recognizes the special relationship our members have to develop at different locations while servicing CPS students. Certainly, Nicole [Bronson] and Catherine [Cooper], as well as all other city-wide CPS teachers and clinicians, work tirelessly to ensure CPS students receive

all they are owed according to the law while they are unable to attend a traditional school setting.

I would like to clear up a few things regarding CTU members' employment and due process rights. As I hope you are aware, the Chicago Board of Education and the CTU have a union contract that affords our members due process rights and a progressive discipline system, should any member commit an infraction of Board policies or rules. What your "feedback" details … does not, in any way, show any such infractions and is based on unknown data collection and seemingly objective [*sic*] measures. Further, any unwarranted progressive discipline must be carried out by a member's direct supervisor. I am not sure what your "feedback" was intended to produce with Nicole's and Catherine's supervisor, although your email leads me to the conclusion you were attempting to convince Tora [Evans] of some kind of infraction. The only person who can initiate any disciplinary action against a CTU member is their supervisor.

The CTU-Board union contract, evaluation (known as REACH) best practices, and REACH handbook have very detailed rules by which members are observed and issued preliminary and summative evaluation scores. Your "feedback" follows no such contract, best practices or handbook. The only person who can complete

REACH observations and issue evaluation scores is Tora, or another Board designee. Again, I am not sure what your "feedback" was intended to produce regarding Nicole's or Catherine's quality of work, but it cannot be used in their REACH evaluation, as you are not an employee of the Board.

I truly hope you, Nicole and Catherine can move forward in a positive light. The allegations in your "feedback" are quite contemptuous. Calling into question their attitudes, work ethics, and accusing them of "not really being committed to patients" is insulting. Your patients are their students, and CTU members are nothing, if not dedicated to CPS students. From [your] email …, it seems like you are in regular communication with their supervisor. I urge you to continue to work this out with her, as your "feedback" has not been received well by the Union or members assigned to work at Lurie.

CTU members have the right to union representation in any meeting with a supervisor they feel may lead to their discipline or termination. These are the Weingarten Rights afforded to them by the National Labor Relations Act. I have advised Nicole and Catherine of these rights.

¶29.

If Ruohonen's intent in sending the February 26 email to Evans was to have Bronson and Cooper assigned elsewhere, as Bronson suggests it was, ¶¶ 47, 54, she failed. Bronson and Cooper both remained at Lurie. Instead, Ruohonen was removed as their representative supervisor. ¶ 29.[2]

Finally, Bronson alleges that for a period of time beginning in the Spring of 2019, she (along with Cooper) was denied adequate office and desk space. The issue arose in May 2019, when Ruohonen emailed Evans to advise her that due to organizational changes, all CPS teachers were being moved to space on the 12th floor of the hospital shared by family services workers and hospital interns. ¶ 39. Bronson and Cooper were concerned to discover that in their newly assigned office space, they did not have adequate room to safely store either their student records, which contained sensitive medical and other confidential information, or their books and other teaching materials. This required the teachers to carry heavy boxes full of their records and materials with them around the hospital. ¶¶ 39, 40. Bronson eventually had to see a podiatrist to address the foot pain she was experiencing as a result of lugging the heavy boxes. ¶ 50. On the teachers' behalf, Evans sent an email to Ruohonen advising her that under the collective bargaining agreement between the Chicago Board of Education and the Chicago Teachers Union, all CPS teachers had a right to "adequate workspace" appropriate to their job duties, including, at a minimum, a desk and a chair and access to a computer, printer, copier, and telephone. ¶ 41.

---

[2] The complaint does not reveal when Ruohonen was removed nor who replaced her as Bronson's representative supervisor at Lurie.

In August 2019, at the start of the new school year, the team of citywide teachers and administrators had a collaborative meeting during which Evans reported that all "site administrators" had been asked to complete a teacher workspace survey to verify that the teachers assigned to each site (presumably including hospitals like Lurie) were being provided with adequate and appropriate workspace at those sites. All site administrators had returned their surveys confirming that the provided workspaces were adequate and appropriate. Evans instructed the teachers to inform her immediately if they discovered that the workspace provided to them was inadequate. ¶ 42.

When Bronson subsequently arrived at Lurie to begin the 2019-2020 school year, she discovered that the office space then assigned to the CPS teachers included only two desks for the three teachers and that Lee's materials were already secured in one of those desks. ¶ 43. During a telephone conference call on October 3, 2019, Evans reported that Ruohonen had requested that one of the three CPS teachers be removed from Lurie because there was not sufficient office space for three teachers. Ruohonen made this request notwithstanding data indicating that even with three teachers working at Lurie, there often were not enough available teacher hours to provide instruction for each of the student-patients hospitalized on any given day. ¶ 45. Evans had been asked by another CPS administrator to inquire whether one of the three teachers assigned to Lurie would be willing to relocate to another hospital. Bronson advised Evans that "space was no longer an issue because she made do with what she was provided over the past 2 months and would continue to make do." ¶ 46. Bronson added that she was well aware that Ruohonen did not wish for Bronson to remain at Lurie, and that if placing

her somewhere else would put a stop to Ruohonen's harassment, which was causing Bronson considerable stress, then Evans should do whatever was necessary to preserve the collaboration between CPS and Lurie. ¶ 47.

Evans went on to report that Ruohonen was drafting an email charging Bronson with HIPAA violations and that Ruohonen wanted the email to be placed in Bronson's personnel file. The charge was evidently based on an email of a kind that Bronson regularly sent to Evans and another CPS administrator containing data concerning the students to whom she provided educational services at Lurie. Bronson remarked that she did not understand how she had committed a HIPAA violation, given that each of the recipients of Bronson's email had independent access to the data summarized in the email, Evans had requested the same data from all citywide teachers on a weekly basis, and Lurie personnel themselves provided a census report of student-patients at the hospital to CPS. ¶ 48.

Later that same day, Bronson, Cooper, and Lee met to discuss the earlier conference call with Evans. After that meeting, Lee sent an email to Evans on behalf of the three teachers. Lee reported that "Catherine, Nicole and I were able to have a discussion as a team, and we all agree that Lurie Children's Hospital most definitely needs to have three CPS Hospital teachers on-site, versus only two, if we want to be able to provide educational services for the CPS students that are inpatients throughout the school year (not to mention providing them with the hour of school time they are legally entitled to)." ¶ 51. Lee also addressed the question of the working space that Lurie had made available to the teachers:

> Overall, I think that the workspace and storage issues have been resolved, for the most part, except for one bin of teaching supplies/decorations, and when I saw Susan [Ruohonen] the other day, she mentioned she may have a place for us to store them. The only other issue is that, as we see more students while the year progresses, we will run out of (locked) space for our student files, even if we only hold onto our frequent flyers (which are many).

¶ 51.

In the wake of that same meeting, Bronson began to feel tightness in her chest as well as a loss of balance. She asked a nurse at Lurie to take her blood pressure, which turned out to be above the normal range, as it had been earlier in the day when Bronson had seen a podiatrist. ¶¶ 50, 52.

We have now summarized the specific incidents of mistreatment that Bronson has detailed in her complaint. More generally, she alleges that "[a]s time passed, [Ruohonen] continued to single out Plaintiff for discriminatory treatment. Plaintiff was subjected to efforts by [Ruohonen] to discipline, reassign and/or terminate her for conduct for which other employees were not punished and [to incidents] of harassment, and disparate treatment. ¶ 54.[3]

On December 12, 2019, Bronson filed a charge of discrimination against Lurie with the Illinois Department of Human Rights and with the Equal Employment Opportunity

---

[3] Again, although the complaint alleges that Ruohonen was at some point removed as Bronson's representational supervisor at the hospital, it does not allege at what point in time this took place.

Commission. On December 30, 2019, the EEOC issued Bronson a notice of her right to sue. R. 1-1 at 2. Bronson then filed suit against Lurie and Ruohonen in the district court.

Counts I and II of Bronson's complaint assert Title VII claims of race discrimination against Lurie for a hostile work environment and disparate treatment. Count IV asserts a claim under section 1981 against both Lurie and Ruohonen for interfering with her right to make and enforce a contract, again based on Bronson's race. Counts III and V assert state-law claims for defamation and tortious interference with contract.

The district court dismissed the Title VII claims against Lurie on the ground that Lurie was not a *de facto* employer of Bronson and could not be sued as such. The court reasoned that it was CPS, and not Lurie, that had the right to control and direct Bronson's work. To the extent that Bronson alleged that Ruohonen attempted to take adverse employment actions against Bronson, the allegations of the complaint showed that she had to pursue such attempts through CPS and Evans, and that she was unsuccessful in doing so. And although Lurie issued a hospital identification badge, pager, and email account to Bronson, designated Ruohonen as her "representative supervisor" at the hospital, trained Bronson with respect to hospital policies and patient privacy under HIPAA, provided Bronson and the other teachers with office workspace, controlled the medical records system, and required Bronson to follow hospital policies (including HIPAA rules), these circumstances were insufficient to show that Lurie was her *de facto* employer. Lurie did not have the power to hire or fire Bronson or direct her work as a teacher; only CPS did. *Bronson*, 2021 WL 1056847, at *4–*5.

The court dismissed the section 1981 claim on the ground that Bronson had not adequately alleged that either Lurie or Ruohonen had tortiously interfered with her contractual rights. The only contractual interference that Bronson had identified was interference with her right under the collective bargaining agreement between CPS and the CTU to adequate workspace. But there was no allegation in the complaint that the parties to the CBA themselves had been induced to commit a contractual breach in that regard; rather, the allegation was that Lurie (which was not a party to the CBA) had failed to provide Bronson with adequate office space. That point aside, although the complaint did suggest in the first instance that Lurie had given Bronson and Cooper inadequate space at the beginning of the 2019-2020 school year, the complaint went on to allege that Bronson herself decided not to make an issue of it, and the email quoted in the complaint indicated that the matter had been resolved to the teachers' satisfaction. Consequently, "it is difficult to see how Bronson can claim that Defendants prevented her from enforcing her right to adequate workspace." *Id.*, at *6.

The court also dismissed the state claim for tortious interference with contract on the same grounds that it cited for dismissing the § 1981 claim, *i.e.*, that Bronson did not adequately allege that the defendants had actually interfered with the rights bestowed on her by the agreement between CPS and the CTU. *Id.*, at *7.

Having dismissed the federal claims, the court dismissed without prejudice the remaining state claim for defamation, allowing Bronson to pursue it in state court.

The court denied Bronson's motion for reconsideration. *Bronson v. Ann & Robert H. Lurie Children's Hosp. of Chicago*, 2022 WL 566126 (N.D. Ill. Jan. 25, 2022).

## II.

We review the district court's decision to dismiss Bronson's complaint *de novo. E.g., KAP Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 523 (7th Cir. 2022). To survive a motion to dismiss, a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). So long as "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the complaint is sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965). For purposes of our review, we accept the well-pleaded facts in the complaint as true and draw reasonable inferences in the plaintiff's favor. *KAP Holdings*, 55 F.4th at 523. "[B]ut legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *Id.* (quoting *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011)).

### A. Title VII

Count I of Bronson's complaint seeks relief pursuant to Title VII for a hostile work environment, and Count II seeks relief under the same statute for disparate treatment, both based on Bronson's race. Only an employer can be liable under Title VII. *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir.

2015).[4] Whether a particular employer constitutes the plaintiff's employer presents a legal question. *DaSilva v. Indiana*, 30 F.4th 671, 672 (7th Cir. 2022). At this point, Bronson does not dispute that CPS was her direct employer: she concedes (and the complaint itself makes clear) that CPS hired her, had the power to direct her work as a teacher, and also had the authority to reassign her to another hospital. Bronson was also a member of the Chicago Teachers Union, which represents teachers employed by CPS. But the cases recognize that an indirect or *de facto* employer can be liable to an individual under Title VII provided it had sufficient control over the terms and conditions of that individual's work. Bronson contends that, on a favorable view of the facts alleged in her complaint, Lurie was her *de facto* employer.[5]

---

[4] Supervisors do not qualify as employers under Title VII, *Williams v. Banning*, 72 F.3d 552, 555 (7th Cir. 1995); *see also Passananti v. Cook Cnty.*, 689 F.3d 655, 662 n.4, 677 (7th Cir. 2012), and accordingly, Bronson does not challenge the district court's decision to dismiss the Title VII claims against Ruohonen on that basis.

[5] There is a parallel framework for assessing whether two employers constitute joint employers of the plaintiff. *See Whitaker v. Milwaukee Cnty., Wis.*, 772 F.3d 802, 810–11 (7th Cir. 2014). That framework is frequently consulted in cases brought pursuant to the National Labor Relations Act of 1935 ("NLRA"), 29 U.S.C. § 151 *et seq.*, and the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq.*, to cite two examples. *See, e.g., DiMucci Constr. Co. v. N.L.R.B.*, 24 F.3d 949, 952–53 (7th Cir. 1994) (NLRA); *Reyes v. Remington Hybrid Seed Co.*, 495 F.3d 403, 408–10 (7th Cir. 2007) (FLSA). The joint-employer framework overlaps substantially with the framework for identifying a *de facto* employer, with a comparable emphasis on control over the plaintiff's work. *Compare Whitaker*, 772 F.3d at 810 (joint employer), *with Love*, 779 F.3d at 702 (*de facto* employer). But the joint-employer framework amounts to somewhat of an awkward fit for

As the district court recognized, we use a multi-factor test focused on the "economic realities" of the parties' relationship and control over the plaintiff's work to determine whether a defendant qualifies as a *de facto* employer. The relevant factors include:

> (1) the extent of the employer's control and supervision over the employee; (2) the kind of occupation and nature of skill required, including whether skills were acquired on the job; (3) the employer's responsibility for the costs of operation; (4) the method and form of payment and benefits; and (5) the length of the job commitment.

*Love*, 779 F.3d at 702 (citing *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378–79 (7th Cir. 1991)) (the "*Knight* factors"); *see also Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 361 (7th Cir. 2016). These factors derive from the same agency principles that we employ to assess whether an individual is the defendant's employee or instead is an independent contractor. *See Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 491 (7th Cir. 1996). The first of these factors is the most important one. *Love*, 779 F.3d at 702–03. Examination of the putative employer's authority over the plaintiff and her work takes into account not only control over the result of the work but the details by which it is achieved. *Id.* at 703 (quoting *Alexander*, 101 F.3d at 493). But the key powers evincing control are the right to hire and fire the plaintiff. *Id.* (citing

---

Title VII cases as we noted in *Whitaker*, 772 F.3d at 811, and the parties do not invoke that framework here.

*E.E.O.C. v. Illinois*, 69 F.3d 167, 171 (7th Cir. 1995)); *see also Bridge*, 815 F.3d at 361–62.

Applying these factors to the facts alleged in Bronson's complaint rules out the possibility that Lurie was her *de facto* employer as a general matter. Bronson's job was that of teacher, and although she performed that work in the hospital setting, the complaint is devoid of any allegations indicating that Lurie exercised any meaningful control or supervision over her teaching activities. To be sure, because the instruction took place on the hospital premises, Lurie exercised control over Bronson's access both to those premises and to the hospital's patients and their medical information, and Lurie took steps to ensure that she was familiar and compliant with hospital rules and policies, including those related to patient privacy. The complaint makes this much clear. But there are no allegations suggesting that Lurie exercised any authority with respect to her work as a teacher. *Cf. Alexander*, 101 F.3d at 493 (anesthesiologist constituted independent contractor rather than employee of hospital notwithstanding facts that hospital required anesthesiologist to be "on call" for specified number of hours per week and hospital's anesthesiology section chief assigned operating room patients to him). Lurie could register objections with CPS as to how effectively Bronson and the other teachers assigned to Lurie were functioning within the hospital environment, and Ruohonen did so. Bronson alleges, in fact, that Ruohonen contacted CPS on multiple occasions complaining about Bronson (and in some cases, her colleague Cooper) and asking in at least one instance that Bronson be reassigned elsewhere. But the complaint leaves no doubt that it was up to CPS to decide whether or not to take action against Bronson. In fact, Ruohonen's alleged campaign to have Bronson removed from her post at Lurie failed;

instead, Ruohonen was removed as Bronson's representative supervisor at Lurie.[6] And although it was up to Lurie to assign Bronson office workspace, it was up to CPS and the CTU to decide whether the assigned space was adequate. Thus, the CTU asked its teachers to confirm whether the workspace provided by the hospital was adequate.

The other *Knight* factors reinforce the notion that CPS, rather than Lurie, was Bronson's sole employer. Bronson was a teacher, and there is no allegation that Lurie was in any respect responsible for her training or certification for *that* role. *See Bridge*, 815 F.3d at 362; *Love*, 779 F.3d at 704. Whatever training and credentials Lurie required of and provided to Bronson were centered on access to the hospital and compliance with hospital protocols rather than Bronson's substantive work as a teacher instructing hospitalized students. *See Love*, 779 F.3d at 704 (providing worksite safety training insufficient to demonstrate control over worker). Lurie no doubt incurred certain costs in hosting Bronson and the other CPS teachers: providing office space, training them in hospital procedures, and supplying pagers, access badges, email accounts and the like. But there is no indication that Lurie paid Bronson's salary or otherwise bore the primary costs of providing instruction to hospitalized students. And finally, although Bronson was assigned to teach at Lurie for a period

---

[6] Bronson points out that her complaint does not reveal who assigned her to Lurie in the first instance and is devoid of detail as to the content of any agreement between Lurie and CPS. She identifies these as matters she would explore in discovery were her suit permitted to proceed beyond the pleading stage. It is true that the complaint is silent on such points. But as we discuss, the other factual allegations of the complaint suffice to demonstrate that Lurie was not Bronson's *de facto* employer.

of three years, which was a substantial period of time, Bronson's primary commitment was to CPS, which had the authority to assign her to another hospital, as Ruohonen—unsuccessfully—urged CPS to do.

It has not escaped our attention that Lurie controlled the premises where Bronson performed her work, and some cases have considered ownership of the facility where the plaintiff worked as a factor distinguishing the work of an employee from that of an independent contractor. *See Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730, 67 S. Ct. 1473, 1477 (1947) (FLSA case). But this factor, although it may lend support to the alternative theory of liability we are about to discuss, is by itself insufficient to suggest that Lurie was Bronson's *de facto* employer in a general sense.

Even if a putative employer does not exercise control over the plaintiff as a general matter, it may qualify as a *de facto* employer if it exercises "control over the specific aspects of his employment related to the subject of his suit," *Tamayo v. Blagojevich*, 526 F.3d 1074, 1088–89 (7th Cir. 2008); *see also Harris v. Allen Cnty. Bd. of Comm'rs*, 890 F.3d 680, 684, 686 (7th Cir. 2018); *Love*, 779 F.3d at 706, and Bronson faults the district court for not considering this possibility. As she sees it, even if Lurie did not control her work as a teacher, it surely did exercise control over the environment in which she was required to perform her duties. Thus, it was Lurie that restricted her access to the EPIC patient records system and made it more difficult for her to meet her students' educational needs; it was Lurie that issued different-colored badges to Bronson and another Black teacher; and it was Lurie's employees, including Ruohonen, who engaged in conduct that stigmatized

and demeaned Bronson in front of hospital patients and workers.

We can assume that Bronson is correct that a specific-control analysis might well be more favorable to her. Any number of workers are regularly required to perform their work in client and other third-party settings that their direct employers do not control. Suppose the employee of an accounting firm is assigned for a substantial period of time to the premises of the firm's client for the purpose of conducting an audit of the client's inventory and financial records, and she experiences severe or pervasive sexual harassment from the client's employees, of which she complains to the client and the accounting firm to no avail. In that scenario, there would be little question as to who the plaintiff's employer was in the usual sense: the accounting firm hired her and had the right to fire her; it paid her; and it controlled the substantive aspects of her work as an auditor wherever she performed it. And that firm, which could both admonish (and even terminate its relationship with) the client and/or remove its employee from the hostile environment, might bear some responsibility to her for the uncorrected harassment. But for the duration of the audit, it was the client who controlled the conditions of the plaintiff's day-to-day work environment. Thus, one might also plausibly argue that the client, which had direct control over the premises and the employees who perpetrated the harassment, ought to be treated as the plaintiff's *de facto* employer for the specific and limited purpose of a hostile environment claim. *See Howard v. Cook Cnty. Sheriff's Office*, 2022 WL 1404833, at *7–*8 (N.D. Ill. May 4, 2022) (denying summary judgment to sheriff's office on hostile environment claim asserted by patient care attendant who was directly employed by county rather than sheriff but was assigned to work

in county jail, the premises and inmates of which were exclusively controlled by sheriff's office; jury could find that sheriff's office was her *de facto* employer for purposes of hostile environment claim); *Diana v. Schlosser*, 20 F. Supp. 2d 348, 352-53 (D. Conn. 1998) (denying summary judgment to radio station on whose morning radio program plaintiff, who was directly employed by traffic data firm, provided on-air traffic updates, where radio station's employee as host of program referred to plaintiff on air as "Big Boobs" and demanded that plaintiff refer to herself in same way); *Moland v. Bil-Mar Foods, Inc.*, 994 F. Supp. 1061, 1072-73 (N.D. Ia. 1998) (denying summary judgment to turkey processing plant on whose premises plaintiff weighed trucks on behalf of her direct employer, a trucking company, and where plaintiff was sexually harassed by plant employees); *King v. Chrysler Corp.*, 812 F. Supp. 151 (E.D. Mo. 1993) (denying dismissal of complaint and summary judgment to automobile manufacturer on whose premises plaintiff's direct employer operated a cafeteria and where plaintiff, who worked in cafeteria as cashier, was sexually harassed by manufacturer's employee).[7]

The problem for Bronson is that she is pursuing this theory for the first time on appeal. In the district court, both she and Lurie argued the matter of control solely as a general matter using the *Knight* factors, and the court itself assessed Lurie's status as putative employer on that basis. Thus, control over Bronson's work as a teacher was treated by the court as the most significant factor in its analysis, and as we have

---

[7] Of course, we are not speaking to the ultimate merits of any such claim. For present purposes, we are simply noting that Bronson might have had a non-frivolous argument that Lurie was her *de facto* employer using a specific-control analysis.

discussed, the complaint does not support an inference that Lurie exercised such control. In neither her memorandum opposing Lurie's motion to dismiss the complaint nor in the memoranda she filed in support of reconsideration did Bronson ever suggest that the court, rather than focusing on who qualified as her employer in a general sense applying the *Knight* factors, should instead focus on the particular circumstances giving rise to her Title VII claims and deem Lurie to be her employer for purposes of those specific circumstances. This circumstance-specific approach is a separate and distinct theoretical basis for finding that a defendant was the plaintiff's *de facto* employer, and Bronson did not put the district court on notice that she was pursuing specific control as an alternate basis for deeming Lurie her *de facto* employer. She may not raise this alternate theory for the first time on appeal. *See, e.g.*, *Cooper v. Retrieval-Masters Creditors Bureau, Inc.*, 42 F.4th 675, 688 (7th Cir. 2022).

The line we have drawn between these two theories of employment may seem artificial at first blush, in that both take into consideration the putative employer's control over aspects of the plaintiff's work. But they do so in significantly different ways: one focuses on whom the plaintiff works for in real terms and the other looks at who was responsible for the particular work conditions that gave rise to her claim of discrimination, irrespective of who hired her, paid her, and controlled the substance of her day-to-day work. Bronson herself acknowledges that the two tests are distinct. Bronson Br. at 5. The claim-specific focus is entirely missing from Bronson's memoranda in the district court. Indeed, the theory reflected in her complaint is that Lurie was her employer, period—Bronson apparently did not anticipate that the district

court might conclude otherwise. She failed to preserve below the specific-control theory she is pursuing now.

Recognizing the possibility that we might come to this conclusion, Bronson in her reply brief urges us to review the district court's focus on general control alone for plain error. Plain error review is available in criminal cases, but needless to say, this is not a criminal case, and with limited exceptions not applicable here, there is no plain-error review in civil cases. *E.g.*, *Walker v. Groot*, 867 F.3d 799, 802–03 (7th Cir. 2017) (noting that Fed. R. Civ. P. 51(d)(1) authorizes plain-error review of civil jury instructions, but that plain-error review otherwise has only limited application in civil litigation and amounts to an extraordinary measure).[8] We have rejected plain-error review in similar circumstances in too many civil cases to count. *See*, *e.g.*, *Henry v. Hulett*, 969 F.3d 769, 786 (7th Cir. 2020) (en banc).

Because the allegations in Bronson's complaint establish that Lurie is not her *de facto* employer as a general matter, she cannot sue Lurie pursuant to Title VII. Counts I and II of the complaint were properly dismissed.

B.  Section 1981

As relevant here, under section 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts … as is enjoyed by white citizens … ." § 1981(a). The statute adds that "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts,

---

[8] Bronson says that "FRCP 52(b)" supports plain error review, Reply Br. at 4 n.1, but she is actually citing the *criminal* rule on this point, *see* Fed. R. Crim. P. 52(b).

and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." § 1981(b). As framed in Bronson's complaint, the section 1981 claim posits that Lurie was her employer (¶ 91) and that by discriminating against Bronson on the basis of her race, Lurie deprived her of the contractual rights she enjoyed as Lurie's employee. ¶¶ 84–85, 87, 90, 97. To that extent, the claim as alleged is one parallel to Bronson's Title VII claims of employment discrimination. *See* R. 25 at 9; *see also*, *e.g.*, *Huang v. Continental Cas. Co.*, 754 F.3d 447, 450 (7th Cir. 2014). But given that Lurie was not Bronson's employer, that theory of liability under section 1981 goes nowhere. Nonetheless, as the district court recognized, we have held that a defendant's interference with a plaintiff's right to make or enforce a contract with another party can also support a claim under section 1981, *see Shaikh v. City of Chicago*, 341 F.3d 627, 630 (7th Cir. 2003), and the court considered whether Bronson might have a plausible claim for relief under that theory.

We have looked to Illinois law, and specifically the tort of tortious interference with contract, for guidance as to what type of action might suffice to establish that a defendant has deprived the plaintiff of her section 1981 right to make and enforce a contract with others. *Id.* at 630–31. To establish a claim for tortious interference with contract under Illinois law, "a plaintiff must show: '(1) the existence of a valid, enforceable contract between the plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional and unjustified inducement of the third party to breach the contract; (4) occurrence of a breach resulting from defendant's conduct; [and] (5) damages[.]'" *Resource Fin. Corp. v. Interpublic Grp. of Cos.*, 2008 WL 4671773, at *2 (N.D. Ill. Oct. 21, 2008) (quoting *Guice v. Sentinel Techs., Inc.*, 689 N.E.2d 355, 359

(Ill. App. Ct. 1997)). To establish that the tortious interference violated section 1981, a plaintiff must additionally show that the defendant was motivated by race when it interfered with the plaintiff's contractual rights. *Muhammad v. Oliver*, 547 F.3d 874, 878 (7th Cir. 2008). Notably, a mere attempt to induce another to deprive the plaintiff of a contractual right will not suffice to show tortious interference; the defendant must actually cause a breach of contract. *Peco Pallet, Inc. v. Nw. Pallet Supply Co.*, 2016 WL 5405107, at *13 (N.D. Ill. Sept. 28, 2016).

The district court accepted the notion that Bronson could pursue a claim against Lurie and Ruohonen[9] for tortiously interfering with her contract rights under the collective bargaining agreement between CPS and the Teachers Union. The complaint—which includes a claim under Illinois law for tortious interference with contract premised on this precise theory—and Bronson's memorandum opposing dismissal below identified interference with Bronson's right to adequate workspace in particular. R. 25 at 3, 10–11, 13. But the court found, in essence, that Bronson had pleaded herself out of court on this claim. Although the complaint indicated that Lurie in the first instance had not supplied the teachers with adequate work space at the hospital (recall that Bronson had to share a desk with Cooper, and the teachers lacked secure space in which to store their records), it also alleged that CPS reminded the hospital of its obligation in this regard, that

---

[9] Although supervisors are not subject to individual liability under Title VII, they can be held liable under section 1981. *See Passananti v. Cook Cnty.*, *supra* n.2, 689 F.3d at 662 n.4 (citing *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004)); *Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016).

Bronson in the end decided not to press the issue, and the complaint quoted an email to the teachers' CTU field representative indicating that the matter was resolved.

Bronson faults the court for relying on the email because she was not the author of that email. But her own complaint quotes the email and notes that it was sent on behalf of all three CPS teachers assigned to Lurie, and the email on its face suggests that the workspace issue was resolved. Nothing in the complaint suggests otherwise. Bronson argues in the briefing that the email did not necessarily reflect her own views, but the complaint certainly does not allege that.

Bronson also suggests the court construed her section 1981 claim too narrowly and did not consider, *inter alia*, whether Lurie and/or Ruohonen may have interfered with her contractual rights under the CBA by subjecting her to a hostile work environment, for example. The complaint is certainly broad enough to include a hostile work environment and other disputed matters beyond the workspace issue. But the only specific provision of the CBA that Bronson cited in her complaint in support of the tortious interference claim was the workspace provision. ¶¶ 41, 104. More to the point, Bronson's response below to the motion to dismiss, which was her opportunity to explain how her complaint should be read, did not develop any other potential basis for the section 1981 claim. *See* R. 25 at 3, 10–11, 13. A court should not have to divine theories that a party represented by counsel does not herself put forward.

Bronson also argues that the district court erred in considering only the contractual relationship between Bronson and CPS (via the collective bargaining agreement with CTU) as the object of interference by the defendants and did not

consider the possibility of a contractual relationship between herself and Lurie. But Lurie rightly argues that as a matter of Illinois law the hospital cannot tortiously interfere with its own contract. *Heiman v. Bimbo Foods Bakeries Distrib. Co.*, 902 F.3d 715, 720 (7th Cir. 2018) (citing *Bass v. SMG, Inc.*, 765 N.E.2d 1079, 1089–90 (Ill. App. Ct. 2002)). And, of course, Ruohonen was Lurie's agent, so her individual actions likewise cannot support a claim of interference with that same contract. *See Small v. Sussman*, 713 N.E.2d 1216, 1221 (Ill. App. Ct. 1999) ("Corporations can act only through their agents.") (citing *Templeton v. First Nat'l Bank of Nashville*, 362 N.E.2d 33, 37 (Ill. App. Ct. 1977)).

Bronson's state-law claim for tortious interference with contract fails for the same reasons that the section 1981 claim does.

### III.

Bronson's federal claims under Title VII and section 1981 were properly dismissed, as was her claim under Illinois law for tortious interference with contract.

AFFIRMED