In the

# United States Court of Appeals
## For the Seventh Circuit

No. 23-1320

ALEXIS WELLS,

*Plaintiff-Appellant,*

*v.*

THE FREEMAN COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 21-cv-00047 — **James R. Sweeney II**, *Judge.*

ARGUED DECEMBER 6, 2023 — DECIDED FEBRUARY 27, 2024

Before FLAUM, EASTERBROOK, and BRENNAN, *Circuit Judges.*

FLAUM, *Circuit Judge.* Alexis Wells claims that she was
hired and then sexually assaulted by Timothy Vaughn. Hav-
ing settled her claims against Vaughn, she seeks to hold his
employer, The Freeman Company, liable under Title VII, the
Indiana Wage Payment Statute, and various tort theories. Be-
cause Wells was an independent contractor, Freeman's con-
duct was not tortious, and Vaughn's actions cannot be at-
tributed to Freeman, we affirm.

## I.  Background

### A.  Factual Background

Wells considered Vaughn her uncle. Vaughn grew up with Wells's mother, and, as adults, they vacationed together with their families. Vaughn and his family also attended the church where Wells's parents were pastors.

When Wells was a senior in high school, she and Vaughn began discussing her interest in modeling. Vaughn asked Wells for her measurements and for photographs of herself in athletic wear and partially nude. Vaughn made these requests under the guise of using his position at Freeman, a corporate event agency, to help Wells launch a modeling career.

But that was not Vaughn's role at Freeman. He was a technical solutions manager in Freeman's audio-visual department. That position involved cultivating client accounts, overseeing budgets, developing quotes for client events, and, when on-site at events, operating as the direct client contact. Most of the time, Vaughn worked remotely from an office in his church (the same church where Wells's parents were pastors).

On January 1, 2020, Vaughn asked Wells to be a production assistant (PA) at one of Freeman's client's events in Florida later that month. At the time, Wells was on winter break from college. Believing that the role could "give [her] a look into a new career option for the future," she agreed. Vaughn inquired whether she had an LLC, as that would impact how she was paid. Wells did not.

In the days that followed, Vaughn submitted internal staffing requests to support the upcoming event. None included Wells. As the event neared, Wells asked Vaughn if the

trip to Florida was still happening. Over a series of texts, he responded, "I think so[.] I'll see what we need to do to get you paid b[y] Freeman[,] [s]ince you['re] not an LLC."

Then, on January 15, Vaughn texted two people working the event—one Freeman employee and one independent contractor—telling them that Wells agreed to work the event as a PA. The same day, Vaughn texted Wells, instructing her to meet him at his office in the church at 1:00 PM "to get some info of[f] to Freeman Agency services to get [her] squared awa[y] for [Florida]." He added, "You are going to start today …[.] Bring a note pad and pen."

When the two met, Vaughn spoke to Wells about filling out a W-2, but she never did. Vaughn also never onboarded Wells with Freeman or Mertzcrew—a freelance management service Freeman uses to retain independent contractors. As for pay, Wells claims she and Vaughn never discussed the amount, but she knew she would be paid hourly: Vaughn instructed her to track her hours. Vaughn recalled telling Wells her hourly wage, the estimated hours she would work, and that she would be reimbursed for travel expenses to Florida.

After starting on January 15, Wells worked from Vaughn's office in the church for the rest of the week. She did not have a set schedule or start time. Rather, Vaughn told Wells to come to the office "when [she was] up and going." Her primary task was comparing two Excel documents listing audio-visual equipment needed at the event, but she also took notes on a few conference calls.

On January 16, Vaughn emailed his Freeman supervisor for the event, Lisa VanRosendale, informing her that Wells agreed to work the event. He explained "[h]er cost [would be]

minimal per day at $50 hr." VanRosendale replied, "Ok just make sure you get this [sic] costs approved …. I trust what you are doing."

Wells flew to Florida on January 19. That night, after checking in to the hotel, she went to dinner with Vaughn and Lloyd Ellis, an independent contractor working the event. Vaughn told Wells that she needed to be able to keep up with their drinking. Ultimately, she and Vaughn consumed at least seven alcoholic drinks each.

During dinner, Vaughn commented on Wells's physical appearance and measurements. After, he followed her to her hotel room. According to Vaughn, he did so because Wells wanted him to look at the clothes she brought for the event. Once in the room, she asked him to take nude photos of her in the bathtub. He agreed, but once he noticed her falling asleep in the bathtub, he helped her put on clothes and get into bed.

Wells's account is quite different. She claims Vaughn asked if she wanted to take updated photos for her modeling portfolio. She agreed. Vaughn directed her to lay on the bed wearing thong underwear so he could take photos with his iPhone. Wells claims that Vaughn told her to shave, so she went to the bathtub to do so. Vaughn followed her into the bathroom, took the razor out of her hand, and began shaving her pubic region. Then, Vaughn took photos of her vagina and groped her genitals. Eventually, Vaughn left, and Wells went to bed.

The next morning Vaughn texted Wells, planning to meet her in the hotel lobby before going to the event site together. By the time Wells was ready, Vaughn had already left the

hotel. Even after Wells joined Vaughn at the event site, she could not do much work because she did not have a computer. The only task Vaughn gave her that morning was to use her cell phone to plan a time to go to Top Golf.

After lunch, Wells was allowed to use a Freeman laptop to continue comparing spreadsheets of equipment needed for the event. The laptop was secured to the table, though, and it had to be unlocked by someone with Freeman credentials before Wells could use it. At the end of the workday, Wells, Vaughn, and Ellis returned to the hotel and ate dinner together. Wells excused herself from dinner, called her family, and left the hotel.

Wells's attorney sent Freeman a pre-suit letter in April 2020. Until then, Wells had not told anyone at Freeman what happened in Florida or requested payment or reimbursement.

## B. Procedural Background

In her operative complaint, Wells brought Title VII, Indiana Wage Payment, Intentional Infliction of Emotional Distress (IIED), and Negligent Infliction of Emotional Distress (NIED) claims against Freeman. After the parties cross-moved for summary judgment, the district court granted Freeman summary judgment on all claims. This appeal ensued.

## II.    Discussion

Through her federal and state law claims, Wells seeks compensation from Freeman for the hours she worked and the alleged harm she suffered. We take her claims in turn.

### A. Title VII and Indiana Wage Payment Statute Claims

Relief under Title VII and the Indiana Wage Payment Statute depends on the worker being an employee of the defendant. *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701–02 (7th Cir. 2015) (explaining that to maintain a suit under Title VII the worker must have been an employee); *Mortg. Consultants, Inc. v. Mahaney*, 655 N.E.2d 493, 495 (Ind. 1995) (holding a worker must be an employee to recover under the Indiana Wage Payment Statute). Because Wells is best classified as an independent contractor, both her claims fail as a matter of law.

Courts in this Circuit use the non-exclusive *Knight* factors to examine the "economic realities" of a working relationship and to determine whether the worker was an employee for purposes of Title VII. *Knight v. United Farm Bureau Mut. Ins.*, 950 F.2d 377, 378–79 (7th Cir. 1991); *cf. Harris v. Allen Cnty. Bd. of Comm'rs*, 890 F.3d 680, 683 (7th Cir. 2018) ("[U]nder any version of the test, the most important question is whether the putative employer exercised sufficient control over the plaintiff."). The factors are:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Knight*, 950 F.2d at 378–79.

We indicated in *Knight* that there are other considerations subsumed within the five-factor test. *Id.* at 379 n.2. In this case, some of those additional factors warrant special attention. They include: "(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision;" (2) "the length of time during which the individual has worked;" and (3) "the method of payment, whether by time or by the job." *Id.*

Application of the factors varies depending on situation; still, courts often emphasize that "[t]he most important factor for determining employment status is an 'employer's right to control.'" *Levitin v. Nw. Cmty. Hosp.*, 923 F.3d 499, 502 (7th Cir. 2019) (quoting *Knight*, 950 F.2d at 378). More than simply evaluating the purported employer's control over "the result to be achieved," we look at whether the purported employer controlled "the details by which that result is achieved." *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 493 (7th Cir. 1996) (citation and internal quotation marks omitted), *as amended on denial of reh'g and reh'g en banc* (Feb. 7, 1997).[1] Given the nature

---

[1] Wells argues that "key powers evincing control are the right to hire and fire the plaintiff." *Bronson v. Ann & Robert H. Lurie Child.'s Hosp. of Chi.*, 69 F.4th 437, 449 (7th Cir. 2023). That consideration is relevant when distinguishing between two potential employers. *Id.* at 448 (applying *Knight* factors to determine whether a school district or hospital was the plaintiff's employer for Title VII purposes). It is irrelevant here, since Freeman is Wells's only potential employer, and there is no evidence that its right to hire or fire was circumscribed when working with independent contractors. *EEOC v. N. Knox Sch. Corp.*, 154 F.3d 744, 749 (7th Cir. 1998) (explaining that if a factor does not aid in distinguishing between employees and independent contractors performing similar work it is less salient).

of this case, it is crucial to avoid mistaking control attributable to Vaughn's unprofessional and allegedly predatory conduct for control attributable to Freeman or reflective of the nature of Wells's work for Freeman. The former is not germane to the *Knight* inquiry. *See N. Knox Sch. Corp.*, 154 F.3d at 748 (explaining that control attributable to "Indiana's significant regulation of the conduct of school bus drivers … reflect[ed] no 'control' by" the school district when determining whether the bus drivers were employees).

We turn to the evidence, starting with control. Vaughn controlled where Wells worked—from his office at the church and on-site in Florida. He ostensibly controlled when Wells reported for work each day, but her schedule was flexible. She was allowed to arrive when she was "up and going" and there were no consequences for arriving late, like when Wells failed to meet Vaughn as planned the morning after her alleged assault. The only occasion when Vaughn and Wells met at a designated time was on her first day.

While in Florida, Vaughn controlled when Wells would eat meals (since they ate together). For example, Vaughn instructed Wells to meet him when she arrived in Florida, explaining they had work to do. However, instead of working, they consumed at least seven alcoholic drinks each. Because Vaughn used the pretense of work to coax Wells to dine with him, this control is attributable to Vaughn only. He dictated when Wells ate to advance his personal relationship with her, not to advance Freeman's business interests.

As for the substance of her work, Vaughn instructed Wells on what tasks she would perform (comparing spreadsheets of audio-visual equipment and taking notes on conference calls) but did not provide Wells with specialized training or review

her work. Also absent is any indication that Vaughn required Wells to perform these tasks in specific ways, for example taking notes using a certain computer program or shorthand.

To form an accurate picture of Freeman's control over Wells, it is helpful to consider the type of work and "whether the work usually [was] done under the direction of a supervisor or [was] done by a specialist without supervision." *Knight*, 950 F.2d at 379 n.2. Freeman "almost always" uses independent contractors, hired through Mertzcrew, as PAs for client events. While this Court is most frequently called upon to evaluate whether highly educated professionals, such as doctors, are independent contractors for purposes of a Title VII claims, it is of no moment that PAs are "skilled in more mundane ways." *Alexander*, 101 F.3d at 493; *Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 438 (7th Cir. 1996) (applying *Knight* factors and concluding that limousine drivers were independent contractors). Freeman still elected to utilize independent contractors to support its short-term production needs at client events.

With the benefit of those considerations, it is clear that most of Freeman's control is either attributable to Vaughn's unprofessional conduct or the inherent nature of PA work (e.g., to be a PA Wells had to follow Vaughn's instructions). Even if Vaughn had held Wells to a strict schedule, that "is not sufficient" to establish control. *Est. of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, 566 (7th Cir. 2009). Most importantly, Wells does not identify any ways Freeman controlled her more than the PAs it hired through Mertzcrew. Because of that, the supervision and control factor, while often determinative, does little to illuminate Wells's status. *N. Knox Sch. Corp.*, 154 F.3d at 749 (holding that because a school

district took all bus drivers' "performance into account when deciding whether to enter into a new contract" this "control" "in no way distinguishe[d] these drivers from any independent contractor," making the factor less relevant). While the control factor is therefore less salient in this case, it still weighs in favor of Wells being an independent contractor.

Two other *Knight* factors are best analyzed together: the "method and form of payment and benefits," whether payment was "by time or by the job," "length of job commitment and/or expectations" as well as "the length of time during which the individual has worked." *Knight*, 950 F.2d at 378–79 & 379 n.2.

Wells and Freeman agree that being paid by the hour is indicative of employee status. *See Worth v. Tyer*, 276 F.3d 249, 263 (7th Cir. 2001); Restatement (Second) of Agency § 220, cmt. j (1958). However, that is not the end of our inquiry. How a worker is paid or, in Wells's case, expected to be paid is also important. In *Worth*, which also involved a workplace sexual assault, an important consideration was that employees were required to fill out timecards while independent contractors were not. 276 F.3d at 263. We also emphasized that "[c]ontracts of a set length often indicate independent contractor status." *Id.* at 262. While Worth submitted regular timecards and discussed career advancement, Wells was instructed to track her hours and expenses to submit after the event concluded—when her work for Freeman would be complete. Wells's payment structure is also similar to how Ellis, an independent contractor, testified he was paid by Freeman: by remitting an invoice with receipts and travel expenses after the event concluded.

The hourly pay structure is colored by Wells's anticipated length of employment: approximately one week. This is significant since it is highly unlikely for a company to hire someone for such a short period of time as an employee. *Cf. Est. of Suskovich.*, 553 F.3d at 567 ("[W]here a person is engaged to work for a limited period of time … that fact favors independent contractor status."). Furthermore, there is a crucial difference between submitting an hourly timesheet at regular intervals corresponding to a pay cycle (like an employee might) and submitting an hourly timesheet at the conclusion of a project (like independent contractors would). An hourly rate-of-pay is not enough to demonstrate employee status, at least in this case. *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 753 (1989) (explaining that independent contractors are "often compensated" after "completion of a specific job" (citation and internal quotation marks omitted)). These factors also weigh in favor of independent contractor status.

The next *Knight* factor examines who bore the "responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations." *Knight*, 950 F.2d at 378–79. Before traveling to Florida, Wells worked out of Vaughn's office in the church. There is no evidence Freeman paid for that office. At the church, Wells used a computer—as well as pen and paper—to work, but there is also no evidence that those materials were provided by Freeman either. Wells gave out her personal email address to others working the event and occasionally used her personal cell phone to communicate about the event.

While in Florida, Wells used a Freeman computer for half a day. But the computer was secured to the table, and someone else used their Freeman credentials to log on.

Independent contractors working the event were permitted to use the same computer. Wells also used her personal cell phone to plan a Top Golf outing when she did not have access to a computer. She incurred travel expenses—her flight, Ubers, and some meals—but was told to submit the receipts for reimbursement.

This factor slightly favors independent contractor status. Some facts, such as Wells never having a Freeman email address, are difficult to ascribe value to because they are less indicative of independent contractor status and more reflective of the lack of formality in Wells's employment. Independent contractors were issued Freeman email addresses (Ellis testified to having an active Freeman email address) and so were Freeman employees. Similarly, Wells anticipated having her travel expenses paid, but so did employees and independent contractors. Had she been formally onboarded with Freeman or Mertzcrew she might have been issued a computer and login credentials. But, examining the facts in the record, Freeman did little to support Wells's work—far less than a bona fide employer would. While the unique facts of Wells's case caution against giving this factor significant weight, it nevertheless favors independent contractor status.

The final *Knight* factor is inconclusive. It considers "the kind of occupation and nature of skill required, including whether skills are obtained in the workplace." *Knight*, 950 F.2d at 378. Freeman used PAs that were independent contractors retained through Mertzcrew. Therefore, a PA is the type of position often filled by an independent contractor. Wells also received minimal training, approximately twenty minutes' worth, from Vaughn.

These facts cut both ways. Acquiring skills on the job is indicative of employee status. However, the fact that Wells received limited training suggests either that the job was not challenging or that Wells already had the requisite skills. Much like our analysis with respect to school bus drivers in *North Knox School Corp.*, this factor does little to differentiate between independent contractors and employees because there is no evidence that PA training varied depending on the worker's status. 154 F.3d at 749; *see also Cent. States, Se. & Sw. Areas Pension Fund v. Nagy*, 714 F.3d 545, 552 (7th Cir. 2013) (holding factor was "inconclusive" where worker was not provided "specialized training" but "performed general management tasks").

Since most of the *Knight* factors weigh in favor of Wells being an independent contractor, her Title VII claim fails as a matter of law. The same goes for her Indiana Wage Payment claim. While Indiana uses the non-exclusive ten-factor test from the Restatement of Agency "to distinguish employees from independent contractors, *Moberly v. Day*, 757 N.E.2d 1007, 1010 (Ind. 2001), those factors overlap with our *Knight* inquiry since both tests are derived from "agency principles," *Alexander*, 101 F.3d at 491; *see also* Restatement (Second) of Agency § 220 (1958) (listing factors that "among others, are considered" when determining whether a worker is an employee or independent contractor). Both tests also focus heavily on evidence of the employer's right to control the worker, manifested through different facts. *Compare Frey v. Coleman*, 903 F.3d 671, 678 (7th Cir. 2018) ("Recall that the *Knight* test … looks to see whether the putative employer exercised sufficient control."), *with Sword v. NKC Hosps., Inc.*, 714 N.E.2d 142, 148 (Ind. 1999) ("It is the employer's right to control that generally separates a servant from an independent

contractor."). Accordingly, the outcome is no different for Wells's state statutory claim.

## B. Indiana Tort Claims

Wells also brings state law claims for IIED and NIED. Both fail as a matter of law.

### 1. IIED

Wells premises her IIED claim on Freeman's pre-litigation conduct. However, this conduct was not so outrageous and "extreme in degree" as to be "atrocious," dooming her claim. Restatement (Second) of Torts § 46, cmt. d (1965).

A defendant intentionally inflicts emotional distress by "(1) engag[ing] in extreme and outrageous conduct (2) which intentionally or recklessly (3) causes (4) severe emotional distress to another." *Curry v. Whitaker*, 943 N.E.2d 354, 361 (Ind. Ct. App. 2011) (citing *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991)). "The requirements to prove this tort are 'rigorous.'" *Id.* (quoting *Cullison*, 570 N.E.2d at 31). Liability will lie "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Conwell v. Beatty*, 667 N.E.2d 768, 777 (Ind. Ct. App. 1996) (quoting Restatement (Second) of Torts § 46, cmt. d (1965)).

Vaughn's alleged sexual assault of Wells could certainly lead "an average member of the community … to exclaim, 'Outrageous!,'" *id.*, but Wells's cause of action concerns Freeman's conduct, not Vaughn's. According to Wells, Freeman acted outrageously by (1) failing to follow its policy when investigating her allegations; (2) creating a fake expense report listing her as Vaughn's business guest; (3) claiming the

expense report was its only record of her being at the event; and (4) claiming that, besides Vaughn, no one at Freeman knew who she was. She claims Freeman took these actions during the run-up to litigation and in proceedings before the EEOC.

Even assuming the veracity of Wells's allegations (which Freeman vehemently denies), none of this conduct is so extreme to be "regarded as atrocious and utterly intolerable in a civilized society." *York v. Fredrick*, 947 N.E.2d 969, 977 (Ind. Ct. App. 2011) (holding that a funeral home and its personnel did not act outrageously when they improperly interred plaintiffs' family member necessitating exhumation).

Moreover, Indiana courts have never extended the tort to cover this sort of pre-litigation conduct. "Federal courts are loathe to fiddle around with state law," *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 607 (7th Cir. 2000), and especially circumspect when it comes to expanding liability under state law, *J.S. Sweet Co. v. Sika Chem. Corp.*, 400 F.3d 1028, 1034 (7th Cir. 2005). Absent guidance from the Indiana courts, we decline to expand the tort of IIED to fit Wells's allegations. While Freeman's internal investigation and representations to the EEOC may have been dishonest or even sanctionable, they were not tortious as a matter of law.[2]

---

[2] Wells also presses that a genuine issue of material fact exists as to whether Freeman acted intentionally. We need not consider this argument since Freeman's conduct was not extreme and outrageous. *Conwell*, 667 N.E.2d at 777 (resolving IIED claim on summary judgment due to absence of outrageous conduct despite a material issue of fact with respect to intent to cause injury).

### 2. NIED

Wells also seeks to hold Freeman vicariously liable for Vaughn's wrongful conduct through her NIED claim. Freeman can only be held responsible if Vaughn's conduct was within the scope of his employment. "Whether an act falls within the scope of employment is generally a question of fact." *Cox v. Evansville Police Dep't*, 107 N.E.3d 453, 460 (Ind. 2018). However, "when the relevant facts are undisputed and would not allow a jury to find that the tortious acts were within the scope of employment, we may conclude as a matter of law that they were not." *Id.*

To be "within the scope of employment, the injurious act must be incidental to the conduct authorized or it must, to an appreciable extent, further the employer's business." *Barnett v. Clark*, 889 N.E.2d 281, 283–84 (Ind. 2008) (citation and internal quotation marks omitted). As this Court has recognized, in the context of sexual misconduct, a genuine issue of fact is only created "where the employee's job duties involved extensive physical contact with the alleged victim, such as undressing, bathing, measuring, or fitting." *Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 612 (7th Cir. 2008); *Barnett*, 889 N.E.2d at 284 (collecting cases). Examples include medical personnel, *Stropes by Taylor v. Heritage House Childs. Ctr. of Shelbyville, Inc.*, 547 N.E.2d 244, 249–50 (Ind. 1989) and a little league equipment manager, *Southport Little League v. Vaughan*, 734 N.E.2d 261, 271–72 (Ind. Ct. App. 2000).

While Vaughn held himself out to Wells as someone who could advance her modeling career and put her in touch with brands for modeling opportunities, none of that "work" was related to his position at Freeman. What matters are what responsibilities Freeman entrusted to Vaughn, not what

responsibilities Vaughn held himself out as having. *Hansen*, 551 F.3d at 612 (explaining that what matters is the scope of "the employee's *job duties*" (emphasis added)). Vaughn testified that he "worked for a sales team," cultivating client accounts, overseeing budgets, and operating as the direct client contact when on-site at events. At most, when generating clients for Freeman, prospective clients would sometimes ask, "Are you working with anyone?" and Vaughn testified that he could recommend "talent" for their projects.

Ultimately, the record is devoid of evidence that Freeman entrusted Vaughn with scouting models, preparing portfolios of aspiring models to recommend to prospective clients, or that such work would advance Freeman's interests "to an appreciable extent." *Barnett*, 889 N.E.2d at 283–84. Even if Vaughn had those responsibilities, there is no evidence that such work "involved extensive physical contact," *Hansen*, 551 F.3d at 612, like work performed by healthcare personnel, *Stropes by Taylor*, 547 N.E.2d at 249–50, or equipment managers, *Southport Little League*, 734 N.E.2d at 271–72. As such, there is no basis for holding Freeman vicariously liable for Vaughn's allegedly tortious conduct. That ends our inquiry.

## III.    Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.